## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | |
|---|---|
| **AMY ANN PITTS,** | ) |
| **Petitioner,** | ) |
| | ) |
| | ) **CASE NO. 2:06-CV-1129-MEF-SRW** |
| **v.** | )   **(CR. NO: 2:04-CR-0025-MEF)** |
| | ) |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| **Respondent.** | ) |

## RESPONSE TO SHOW CAUSE ORDER
## REGARDING GOVERNMENT'S MOTION TO DISMISS
## PETITIONER'S 28 USC 2255 MOTION

Comes now the United States by and through Leura G. Canary, United States Attorney, who respectfully submits the following support, in Response to this Court's Order filed January 24, 2007 (Doc. #10):

1. On January 23, 2007, the United States filed for leave to move this Court to dismiss the Petitioner's (Pitts') motion filed pursuant to 28 U.S.C. § 2255 ("2255 Motion") on the grounds that Pitts had waived her right to file the motion. On January 24, 2007, this Court ordered the United States, by February 2, 2007, to provide additional support for the contention that Pitts' 2255 Motion was barred because of the waiver. The gist of the order was a concern that the District Court had possibly rejected the Fed. R. Crim. P. 11(c)(1)(C) plea agreement in this case,

or a portion of it, thus invalidating the waiver provision contained in it. (Doc. #10, at 1).

2.   First, Pitts was aware of the appeal and collateral waiver provision contained in the plea agreement. See Exhibit A (plea agreement, attached), at ¶ 3(e).

3.   Second, the Magistrate Judge assigned to this matter discussed the appeal waiver provisions with Pitts during the course of accepting her guilty plea to the charges in this matter. See Exhibit B (Transcript, Change of Plea Hearing, attached) at 8:23-9:6. Pitts indicated that she understood the implications of this waiver. Id. at 9:7. The Magistrate Judge assigned to this matter further found that Pitts, in changing her plea to guilty, was fully competent and capable of entering her plea, that she was aware of the charges and consequences of her plea, and that her plea was made knowingly and voluntarily. Id. at 11:11-16.

4.   Third, the District Court did not reject the plea agreement in this case. It is clear that Pitts' post-guilty plea conduct violated the terms of her agreement to cooperate with the Government, found in paragraph (4)(j) of the plea agreement, and thus the Government was released from its obligation to recommend a 36-month sentence of imprisonment. See Exhibit C (Transcript, Sentencing Hearing, attached) at 4:11-5:11, 6:5:20-6:5.   The agreement itself allowed for the Government to be released from its obligation to recommend a 36-month sentence,

if Pitts failed to comply with her obligations, without the plea agreement being invalidated.  Exh. A, at ¶ (4)(j), Exh. C, at 4:18-5:6.  Thus, this clause allowed for the sentence imposed in this case to be higher than the 36-month sentence originally anticipated and the District Court continued to comply with the plea agreement reached in this case, even in sentencing Pitts to 121 months.  It is clear that the District Court did not intend to reject the plea agreement, or the appeal/collateral attack waiver contained therein, because:

(a) he did not allow Pitts to withdraw her guilty plea; and,

(b) he reiterated to Pitts that, "[c]onsistent with [the] Court's ruling, the Court determined that [she] entered into a binding plea agreement." Exh. C, at 87:12:-13.  The sentencing judge went on to point out that "[a]s part of that binding plea agreement [Pitts] waived [her] right of appeal or collateral attack." Id. at 87:15-16.  The sentencing judge advised Pitts that, with a few exceptions, including those delineated in the plea agreement, such waivers are generally enforceable.  Id. at 87:23-88:2.  Pitts indicated that she understood her rights regarding her ability to appeal or collaterally attack the sentence, and went on to state that she had no questions about those provisions.  Id. at 88:4-9.

5. Accordingly,

(a) as Pitts' waiver is of the type that is generally enforceable

3

(Williams v. United States, 396 F.3d 1340, 1341 (11th Cir. 2005); see also, United States v. Buchanan, 131 F.3d 1005 (11th Cir. 1997));

(b) since this Court has determined that entering into the waiver was done knowingly and voluntarily (Id);

(c) because requiring the United States to file a response "where there has a valid…waiver undermines the interests of both the government and the defendants generally." United States v. Bascomb, 451 F.3d 1292, 1294 (11th Cir. 2006). "[P]lea agreements containing such waivers save the government time and money by conveying an immediate and tangible benefit in the saving of prosecutorial resources." Id., quoting Buchanon, 131 F.3d at 1008-09. "Requiring the government to file [a response to Pitts' motion] even though there is an appeal waiver substantially diminishes the value of the waiver to the government, and by extension to defendants who are willing to bargain away their right…" Id; and,

(d) it is "clear from the plea agreement and the Rule 11 colloquy, or from some other part of the record, that the defendant knowingly and voluntarily entered into a…waiver, that waiver should be enforced without requiring the government to brief the merits…" (Id);

the United States respectfully requests leave of this Court to file a motion to dismiss Pitts' 2255 Motion, rather than to file a response on the merits.

4

Respectfully submitted this the 2nd day of February, 2007.

LEURA G. CANARY
United States Attorney

/s/ Todd A. Brown
TODD A. BROWN
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
ASB-1901-O64T
Todd.Brown@usdoj.gov

**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **AMY ANN PITTS,** | ) |
|     **Petitioner,** | ) |
| | ) **CASE NO. 2:06-CV-1129-MEF-SRW** |
|     **v.** | )   **(CR. NO: 2:04-CR-0025-MEF)** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
|     **Respondent.** | ) |

**CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2007, I mailed, via United States Mail, a

copy of the instant motion for leave to file a motion to dismiss to the following:

> Amy Ann Pitts
> No. 11373-002
> FPC Marianna
> Marianna, FL  32446.

          Respectfully submitted,

          LEURA G. CANARY
          UNITED STATES ATTORNEY

          /s/ Todd A. Brown
          TODD A. BROWN
          Assistant United States Attorney
          Post Office Box 197
          Montgomery, Alabama 36101-0197
          (334) 223-7280
          (334) 223-7135 fax
          ASB-1901-O64T
          Todd.Brown@usdoj.gov

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA    )
                                )
         v.                    )     CR. NO.  2:04-cr-25-F
                                )
AMY PITTS                    )

## PLEA AGREEMENT

DEFENSE COUNSEL:           BARRY E. TEAGUE

ASSISTANT U.S. ATTORNEY:     TERRY F. MOORER

## COUNT AND STATUTES CHARGED:

Count 1      21 U.S.C. 841(a)(1)

Possession of a Controlled Substance with Intent to Distribute.

## MAXIMUM PENALTY:

21 U.S.C. 841(a)(1)

Possession of a Controlled Substance (methamphetamine) with Intent to Distribute.

Sentence:  a term of imprisonment which may not be less 10 years, nor more than Life, and a fine of $2,000,000.00, or both; a term of supervised release of not less than 5 years; and an assessment fee of $100.00.

## ELEMENTS OF THE OFFENSE

Count 1:     21 U.S.C. 841(a)(1)

Possession of a Controlled Substance with Intent to Distribute.

First:        That the defendant knowingly possessed a controlled substance as charged; and



Second:    That the possession was unlawful

Third:    That the defendant intended to distribute the narcotics as alleged.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Terry F. Moorer, Assistant United States Attorney, and Barry E. Teague, Esquire,

attorney for the defendant, pursuant to Rule 11(c)(1)(C) Federal Rules of Criminal

Procedure, as amended, have, with the authorization of the undersigned defendant,

heretofore entered into discussions with a view towards reaching a pretrial conclusion of

the charges pending in the Indictment herein and a Plea Agreement has been reached by

said parties.

## GOVERNMENT'S PROVISIONS

1. Upon entering a plea of guilty by the defendant to the offenses charged in the

Indictment, the attorney for the Government will do the following:

a.  The Government  agrees that the defendant shall receive a 36 month

sentence of imprisonment.

b.  The Government agrees to file a motion for downward departure under

the provisions of Rule 35, Federal Rules of Criminal Procedure, if the defendant provides

substantial assistance to the United States in other cases.

2. The United States reserves the right to inform the Court and the Probation Office

of all facts pertinent to the sentencing process, including all relevant information concerning

the offenses and the defendant's background.

## DEFENDANT'S PROVISIONS

3. The defendant agrees to the following:

2

a. To plead guilty to Count 1 of the Indictment.

b. It is understood that by signing this agreement, you agree to provide substantial assistance to law enforcement agents. "Substantial assistance" with law enforcement agents under this agreement is understood to include, but is not limited to, the following:

(1)     Making consensually monitored telephone calls to, or otherwise contacting, persons known to be involved in violations of the law.

(2)     Introducing undercover law enforcement officers to persons you know to be involved in illegal activity.

(3)     Maintaining contact with the law enforcement agents with whom you are working.   You shall work under the direct supervision of law enforcement agents.   At no time are you authorized to take any actions without first obtaining the direct authorization of such agents. Any independent and unauthorized actions will be deemed a violation of this agreement.

(4)     Testifying truthfully against any such persons before any and all grand juries and at any and all hearings and trials.

(5)     You agree to make a good faith effort to assist law enforcement agencies in arranging and making undercover contacts with other persons you know to be involved in illegal activity.

(6)     You will cooperate fully and truthfully with the government in this investigation and in any other federal criminal investigation.  You will

3

respond, completely, fully and truthfully to all inquiries addressed to you by representatives of the government, and you will testify fully and truthfully at any and all reasonable times and places before grand juries and against any and all defendants at the trial of any and all cases arising from this investigation or any other such investigation.

## FACTUAL BASIS

d.   The defendant admits the allegations charged in the Indictment and understands that the nature of the charge to which the plea is offered involves proof as to the charge in the Indictment.  Specifically, the defendant admits the following to be true and correct:  On January 28, 2004, officers conducted a search warrant at the defendant's home in Montgomery, Alabama. During the search, officers found approximately 4 ounces of methamphetamine which the defendant intended to sell.  Prior to January 28, 2004, the defendant admits to selling approximately 380 grams of a methamphetamine in the Middle District of Alabama and elsewhere.

## DEFENDANT WAIVES APPEAL AND COLLATERAL ATTACK

e.  Understanding that 18 U.S.C. § 3742 provides for appeal by a defendant of the sentence under certain circumstances, the defendant expressly waives any and all rights conferred by 18 U.S.C. § 3742 to appeal the sentence.  Defendant further expressly waives the right to appeal the conviction and sentence on any other ground and waives the right to attack the sentence in any post-conviction proceeding. This waiver does not include the right to appeal on the grounds of ineffective assistance of counsel and prosecutorial misconduct.

4

Notwithstanding the above, the defendant reserves the right to file a direct appeal of an upward departure from the applicable Guidelines range which the sentencing court specifies at the time of sentencing as having been imposed pursuant to either U.S.S.G. § 4A1.3 (from criminal history category) or § 5K2.O (from offense level). The defendant understands and agrees that this waiver as to all other Guidelines findings would still be in force and effect notwithstanding the appealability of an upward departure.

Further, the defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum set for the offense and pursuant to the sentencing guidelines and expressly waives the right to appeal defendant's sentence, directly or collaterally, on the ground that the sentencing guidelines are in any respect unconstitutional, on the grounds that any fact found by the Court for sentencing was not alleged in the Indictment, admitted by the Defendant, found by a jury, or found beyond a reasonable doubt, and on any other ground, including the applicability of the "safety valve" provisions contained in 18 U.S.C. §3553(f) and USSG § 5C1.2, except for an upward departure by the sentencing judge, a sentence above the statutory maximum, or a sentence in violation of the other law apart from the sentencing guidelines; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742, then except for the waiver of appeal on the ground that the sentencing guidelines are in any respect unconstitutional and on the grounds that any fact found by the Court for sentencing was not alleged in the Indictment, admitted by the defendant, found by a jury, or found beyond a reasonable doubt, the waiver of which will remain in force, the defendant is released from this waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

5

In return for the above waiver by the defendant, the Government does not waive its right to appeal the sentence imposed in the instant case. The Government does not waive its right to appeal any order dismissing the Indictment, vacating a sentence, or otherwise terminating the prosecution at any stage of the proceedings. Further, the parties agree that nothing in this agreement shall affect the Government's right and/or duty to appeal as set forth in 18 U.S.C. § 3742(b).

DEFENDANT'S UNDERSTANDING AND ACKNOWLEDGMENT

4. The defendant, before entering a plea of guilty to Count 1 of the Indictment, as provided for herein by said Plea Agreement, advises the Court that:

a. The discussions between the attorney for the Government and the attorney for the defendant towards reaching an agreed plea in this case have taken place with the defendant's authorization and consent.

b. The defendant further understands that, pursuant to 18 U.S.C. § 3013, said $100.00 assessment fee is to be paid by the defendant on the date of sentencing and that, if a fine is imposed by the Court at sentencing, the defendant shall meet with a member of the Financial Litigation Section of the United States Attorney's Office on the day of sentencing and complete a written personal financial statement setting forth the defendant's assets and liabilities as of the date of the offense. The defendant will make an honest, good faith effort to pay said fine as directed by the Financial Litigation Section of the United States Attorney's Office. The defendant further understands that by completing the financial statement, the defendant is representing that it is true and accurate to the best of the defendant's information, knowledge, and belief.

6

c. The defendant understands that the defendant has a right to be represented by an attorney at every stage of the proceedings against the defendant herein and is represented by the defendant's undersigned attorney.

d. The defendant understands that the defendant has the right to plead not guilty and has the right to be tried by a jury and, at a trial thereof, has the right to the assistance of counsel, the right to confront and cross-examine witnesses against the defendant, the right to call witnesses in the defendant's own behalf, and the right not to be compelled to incriminate the defendant, and that if the defendant enters a plea of guilty herein, there will not be a further trial of any kind and that by the entry of such a plea, the defendant waives the right to a trial by jury or to a trial before the Court.

e. The defendant further understands that in entering a plea of guilty herein, the Court may ask questions about the offense to which the plea is entered and further understands that if the defendant answers these questions under oath, on the record, and in the presence of counsel, which questions and answers would be recorded, that the answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

f. The defendant further understands and advises the Court that the Plea Agreement as set forth herein and the plea to be entered by the defendant as a result thereof is voluntary on the defendant's part and is not the result of any force or threats or of any promises apart from the aforesaid Plea Agreement. The defendant further advises the Court that the Plea Agreement set forth herein is the result of prior discussions between the attorney for the Government and the attorney for the defendant, all conducted with the defendant's authorization, knowledge, and consent.

7

g.  The defendant further advises the Court that the defendant's understanding of this Plea Agreement is as set forth in this document.

h. The defendant further understands that the Government can only make a recommendation, which is not binding upon the Court.  However, if the Court does not accept the Plea Agreement, the defendant may withdraw her guilty plea, if she so chooses.

i. The defendant further advises the Court that the defendant understands and has been advised that evidence of a plea of guilty, later withdrawn or an offer to plead guilty to the crime charged in the Indictment herein, or of statements made in connection with and relevant to said plea or offer to plead, shall not be admissible in any civil or criminal proceedings against the defendant. However, the defendant does understand that evidence of a statement made in connection with and relevant to a plea of guilty, later withdrawn, or an offer to plead guilty to the crimes charged in the Indictment herein, is admissible in a criminal proceeding for perjury or false statement when the statement was made by the defendant under oath, on the court record, and in the presence of counsel.

j.  The defendant further understands that if the defendant has failed or should fail in any way to fulfill completely the defendant's obligations under this agreement, including, but not limited to, committing any new state or federal criminal offense while awaiting sentencing, then the Government will be released from its commitment to honor all of its obligations to the defendant without the defendant being able to withdraw his guilty plea. The determination of whether the defendant has breached this Plea Agreement by failing to fulfill the defendant's obligations herein, will be at the sole discretion of the Government.

8

k.  The defendant is satisfied that defense counsel has been competent and effective in representing defendant.

5.  The undersigned attorneys for the Government and for the defendant represent to the court that the foregoing Plea Agreement is the agreement of the parties that has been reached pursuant to the Plea Agreement procedure provided for in Rule 11(c)(1)(C), Federal Rules of Criminal Procedure, as Amended. The attorney for the defendant further advises the Court that the defendant has been advised of the nature of the charge to which the foregoing described plea is to be offered, and that the defendant has been advised of the defendant's right to plead not guilty and to be tried by a jury on all issues herein; of the maximum possible penalty provided by law; that by the entering of a plea of guilty as aforesaid, the defendant waives the right to be tried by a jury or by the Court, waives the right to confront and cross-examine witnesses against the defendant and the right not to be compelled to incriminate the defendant; and that if the defendant pleads guilty, there will not be a further trial of any kind. Further, the defendant has been advised that if the defendant pleads guilty, the Court may ask questions about the offense to which the defendant has pleaded and that if the plea is rejected or later withdrawn, that the answers to such questions may not be used against the defendant in a civil or criminal proceeding, but that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement if the answers are not truthful.

6.  The defendant understands that the U.S. Probation Office will prepare a presentence investigation report for the Court. The Probation Officer will consider the defendant's conduct related to the offense to which the plea is offered, as well as the defendant's criminal history. The offense level or criminal history category, as calculated

9

by the Probation Officer and determined by the court, may differ from that projected by

defendant's counsel or the U.S. Attorney.

This _____13th_____ day of December, 2004.

Respectfully submitted,

LEURA GARRETT CANARY
UNITED STATES ATTORNEY

Louis V. Franklin, Sr.
Chief - Criminal Division
U.S. Attorney's Office
Post Office Box 197
Montgomery, Alabama 36101-0197
334-223-7280
334-223-7135   fax

Terry F. Moorer
Assistant United States Attorney

10

I have read the foregoing Plea Agreement, understand the same, and the matters and facts set forth therein accurately and correctly state the representations that have been made to me and accurately set forth the conditions of the Plea Agreement that has been reached.

IN ADDITION TO THE FOREGOING PROVISIONS TO WHICH I AGREE, I SWEAR UNDER PENALTY OF PERJURY THAT THE FACTS IN THE "FACTUAL BASIS" PARAGRAPH ABOVE ARE TRUE AND CORRECT AND THAT I AM SATISFIED THAT I HAVE RECEIVED COMPETENT ADVICE AND REPRESENTATION FROM MY DEFENSE COUNSEL.

_____
AMY PITTS
Defendant

_____
Date

_____
BARRY E. TEAGUE
Attorney for the Defendant

_____
Date

11

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE MIDDLE DISTRICT OF ALABAMA

3                     NORTHERN DIVISION

4

5   UNITED STATES OF AMERICA

6        vs.                          CR NO:   04cr-25-F

7   AMY ANN PITTS

8

9

10                 *  *  *  *  *  *  *  *  *  *

11                  CHANGE OF PLEA HEARING

12                 *  *  *  *  *  *  *  *  *  *

13            Before The Honorable Susan Russ Walker,

14            United States Magistrate Judge, at

15            Montgomery, Alabama, on April 11, 2005

16                 *  *  *  *  *  *  *  *  *  *

17

18   APPEARANCES:

19   FOR THE GOVERNMENT: Terry F. Moorer
                        Assistant United States Attorney
20
     FOR THE DEFENDANT:  Barry E. Teague,
21                       Attorney at Law

22

23

24

25

GOVERNMENT
EXHIBIT

B

1          (The above case coming on for hearing at Montgomery,

2  Alabama, on April 11, 2005, before the Honorable Susan Russ

3  Walker, United States Magistrate Judge, the following

4  proceedings were had commencing at 3:20 p.m.:)

5          THE COURT:  The next case is United States versus Amy

6  Pitts.  This is 2:04cr-25-F.  Ms. Pitts, we will be going

7  through the same colloquy that you just heard.  Previously the

8  Court was informed that the Defendant wishes to change her plea

9  and consents to having the guilty plea proceedings conducted by

10 a United States Magistrate Judge.  I am a United States

11 Magistrate Judge, the next higher ranking Judge is a District

12 Judge, and you have the right to have a District Judge take your

13 plea.  If you wish to have me take your plea you must read and

14 sign the consent form.

15         THE DEFENDANT:  (complies)

16         MR. TEAGUE:  (complies)  She listened to me, Judge, she

17 consents to entering a plea before you.

18         THE COURT:  I am flattered, Mr. Teague.  All right.

19 The form has been signed.  Would counsel please summarize the

20 provisions of the plea agreement.

21         MR. MOORER:  Yes, Your Honor.  The Defendant is going

22 to enter a guilty plea to count one of the indictment which is

23 possession with intent to distribute narcotics.  And in return

24 for her cooperation in this case the United States is agreeing

25 that she will receive a 36 month term of imprisonment, and that

3

```
 1   for any cooperation she renders in future cases she'll get
 2   consideration under either Rule 35 or if it's complete before
 3   sentencing 5K.  She is -- her terms of her cooperation are set
 4   out.  She has agreed to waive her right to appeal or
 5   collaterally attack her sentence.
 6             THE COURT:  All right.
 7             MR. TEAGUE:  It's an 11(c)(1)(C) plea, Your Honor.
 8             THE COURT:  All right.  Anything else?
 9             MR. MOORER:  That's essentially the terms, Your Honor.
10             THE COURT:  All right.  We will swear the Defendant in.
11             THE CLERK:  You do solemnly swear or affirm that the
12   testimony you give in this cause will be the truth, the whole
13   truth, and nothing but the truth, so help you God.
14             THE DEFENDANT:  I do.
15             THE COURT:  All right.  Ms. Pitts, do you understand
16   that you are now under oath and if you answer any of the
17   questions asked here falsely your answers may later be used
18   against you in another prosecution for perjury or making a false
19   statement?
20             THE DEFENDANT:  Yes, Your Honor.
21             THE COURT:  What is your full name?
22             THE DEFENDANT:  Amy Ann Pitts Wadsworth.
23             THE COURT:  How old are you?
24             THE DEFENDANT:  26.
25             THE COURT:  How far did you go in school?
```

1          THE DEFENDANT:  I graduated 12th.

2          THE COURT:  Have you been treated recently for any

3    mental illness or addiction to narcotic drugs of any kind?

4          THE DEFENDANT:  No, ma'am.

5          THE COURT:  Are you currently under the influence of

6    any drug, medication or alcoholic beverage of any kind?

7          THE DEFENDANT:  No, ma'am.

8          THE COURT:  Have you received a copy of the indictment

9    pending against you, that is, the written charges made against

10   you in this case?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Have you fully discussed those charges and

13   the case in general with Mr. Teague as your counsel?

14         THE DEFENDANT:  Yes, Your Honor, I have.

15         THE COURT:  Are you fully satisfied with the counsel,

16   representation and advise given to you in this case by your

17   attorney, Mr. Teague?

18         THE DEFENDANT:  Yes, I am.

19         THE COURT:  There's a written plea agreement in this

20   case, did you have an opportunity to read and discuss the plea

21   agreement with your lawyer before you signed it?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURT:  Does the written plea agreement represent

24   in its entirety any understanding that you have with the

25   government?

1       THE DEFENDANT:  No, ma'am.  Wait, I didn't understand
2  that, sorry.
3       THE COURT:  My question is is all of your agreement
4  written in that plea agreement?
5       THE DEFENDANT:  Yes, Your Honor.
6       MR. TEAGUE:  I think what you are referring to is
7  beyond this plea if there's further cooperation and assistance
8  to the government in other cases your understanding is we don't
9  know what we would get but we would get something there for
10  that.
11       THE DEFENDANT:  Yes.
12       MR. TEAGUE:  Is that what you meant by that?
13       THE DEFENDANT:  Yes.
14       THE COURT:  Do you understand the terms of the plea
15  agreement?
16       THE DEFENDANT:  Yes, ma'am.
17       THE COURT:  Has anybody made any other or different
18  assurance to you in an effort to induce you to plead guilty in
19  this case?
20       THE DEFENDANT:  No, ma'am.
21       THE COURT:  Do you understand that if the Court chooses
22  not to follow the terms of the plea agreement the Judge will
23  give you the opportunity to withdraw your plea of guilty and
24  that if you choose not to withdraw your plea he may impose a
25  more severe sentence without being bound by the plea agreement?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Has anyone attempted in any way to force

3  you to plead guilty in this case?

4          THE DEFENDANT:  No, ma'am.

5          THE COURT:  Are you pleading guilty of your own free

6  will because you are guilty?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  Do you understand that the offense to which

9  you are pleading guilty is a felony offense, that if your plea

10  is accepted you will be adjudged guilty of that offense, and

11  that such adjudication may deprive you of valuable civil rights,

12  such as the right to vote, the right to hold public office, the

13  right to serve on a jury and the right to possess any kind of

14  firearm?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  The maximum penalty for this offense, count

17  one, to which you are pleading guilty is no less than ten years

18  imprisonment, no more than life imprisonment, a fine of two

19  million dollars, or both the fine and the imprisonment, a term

20  of supervised release of not less than five years and an

21  assessment fee of one hundred dollars.  Do you understand the

22  maximum penalty in this case?

23          THE DEFENDANT:  Yes, ma'am, I do.

24          THE COURT:  With regard to supervised release do you

25  understand that if you violate the conditions of supervised

1   release you can be given additional time in prison?

2            THE DEFENDANT:  Yes, ma'am.

3            THE COURT:  Do you understand that you must pay a

4   special assessment fee of one hundred dollars in this case?

5            THE DEFENDANT:  Yes, ma'am.

6            THE COURT:  Do you understand that under the Sentencing

7   Reform Act of 1984 the United States Sentencing Commission has

8   issued guidelines for judges to follow in determining the

9   sentence in a criminal case?

10           THE DEFENDANT:  Yes, ma'am.

11           THE COURT:  Do you understand that under recent Supreme

12  Court cases those sentencing guidelines are now considered to be

13  advisory guidelines?

14           THE DEFENDANT:  Yes, ma'am.

15           THE COURT:  And have you and your attorney talked about

16  how the sentencing guidelines which are now advisory might apply

17  to your case?

18           THE DEFENDANT:  Yes, ma'am.

19           THE COURT:  Do you understand that parole has been

20  abolished and that if you are sentenced to prison you will not

21  be released on parole?

22           THE DEFENDANT:  Yes, ma'am.

23           THE COURT:  Do you understand that under some

24  circumstances you or the government may have the right to appeal

25  any sentence that the Court imposes?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  And do you understand that by entering into

3  this plea agreement and entering a plea of guilty you will have

4  waived or given up your right to appeal all or part of this

5  sentence?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Do you understand that you have a right to

8  plead not guilty to any offense charged against you and to

9  persist in that plea, that you would then have the right to a

10  trial by jury, that at trial you would be presumed to be

11  innocent and the government would have to prove your guilt

12  beyond a reasonable doubt?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  Do you understand that you would have the

15  right to the assistance of counsel for your defense, the right

16  to see and hear all the witnesses and have them cross-examined

17  in your defense, the right on your own part to decline to

18  testify unless you voluntarily elected to do so in your own

19  defense, and the right to the issuance of subpoenas or

20  compulsory process to compel the attendance of witnesses to

21  testify in your defense?

22          THE DEFENDANT:  Yes, ma'am.

23          THE COURT:  Do you understand that should you decide

24  not to testify or put on any evidence these facts can not be

25  used against you?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Do you further understand that by entering

3    a plea of guilty if that plea is accepted by the District Judge

4    there will be no trial and you will have waived or given up your

5    right to a trial as well as those other rights associated with a

6    trial as I have just described them?

7          THE DEFENDANT:  Yes, ma'am.

8          THE COURT:  The charge to which you are pleading guilty

9    is set out in count one of the indictment.  That count charges

10   that on or about January 28th, 2004, in Montgomery County,

11   within the Middle District of Alabama, you knowingly and

12   intentionally possessed with intent to distribute 50 grams or

13   more of methamphetamine, a Schedule II controlled substance, in

14   violation of 21 U.S.C. Section 841(a)(1).  You understand that's

15   the charge you are pleading guilty to?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  The elements of this offense which the

18   government would have to prove in your case beyond a reasonable

19   doubt are, first, that you knowingly possessed a controlled

20   substance as charged; and second, that the possession was

21   unlawful; third, that you intended to distribute the narcotics

22   as alleged.  Do you understand those elements?

23         THE DEFENDANT:  Yes, ma'am.

24         THE COURT:  I need to find whether or not there's a

25   factual basis for the plea, how would y'all like to proceed?

1              MR. TEAGUE:  I could ask her questions if you would
2    like.
3              MR. MOORER:  Fine.
4              THE COURT:  Go ahead, Mr. Teague.
5                        EXAMINATION
6    BY MR. TEAGUE:
7    Q.  Ms. Pitts, I believe you were at 2500 Lenox Court on the
8    date of January 28th, 2004?
9    A.  Yes.
10   Q.  And somewhere before that date and the agents in this case
11   came to your house with a federal search warrant and found in an
12   outbuilding located in your back yard the methamphetamine
13   charged in this case, or some of the methamphetamine; is that
14   correct?
15   A.  Yes, sir.
16   Q.  Okay.  Did you possess that methamphetamine with intent to
17   distribute to others?
18   A.  Yes, sir.
19   Q.  Okay.  And on other occasions you had possessed other
20   amounts that would make up the sum or aggregate amount of at
21   least 50 grams or more?
22   A.  Yes, sir.
23   Q.  Okay.  And was that all within the Middle District of
24   Alabama here that you possessed that?
25   A.  Yes, sir.

1          MR. TEAGUE:  Okay.

2          THE COURT:  You knew that was against the law, didn't

3     you?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  Okay.  Anything else, Mr. Moorer?

6          MR. MOORER:  No, Your Honor, I believe that's a

7     sufficient factual basis to support her guilty plea.

8          THE COURT:  How do you plead to the count against you

9     in count one, guilty or not guilty?

10          THE DEFENDANT:  Guilty.

11          THE COURT:  It is the finding of the Court in the case

12     of United States versus Amy Pitts that the Defendant is fully

13     competent and capable of entering an informed plea, that the

14     Defendant is aware of the nature of the charges and the

15     consequences of the plea, and that the plea of guilty is a

16     knowing and voluntary plea supported by an independent basis in

17     fact containing each of the essential elements of the offense.

18     I will therefore recommend that the plea be accepted.

19          A written presentence report will be prepared by the

20     probation office to assist the Court in sentencing.  You will be

21     asked to give information for the report.  Your attorney may be

22     present for that if you wish.  The Court will permit you and

23     your counsel to read the presentence report and to file any

24     objections to the report before the sentencing hearing, and you

25     and your counsel will have the opportunity to speak on your

1   behalf at the sentencing hearing.  The date for sentencing will
2   be set by order.

3           MR. MOORER:  Your Honor, if I may.  I don't know how
4   y'all handle the scheduling of it but if we could have at least
5   four months before her sentencing because of some matters that
6   we are involved in.

7           THE COURT:  Okay.  What you actually will need to do is
8   communicate that to the District Judge.

9           MR. MOORER:  Yes, Your Honor.

10          THE COURT:  Because they set those dates.

11          MR. MOORER:  Okay, Your Honor.

12          THE COURT:  If you would do that.

13          MR. MOORER:  Yes, Your Honor.

14          THE COURT:  Ms. Taylor, who is assigned to this case?

15          THE CLERK:  Judge Fuller.

16          THE COURT:  This is Judge Fuller.  I need to discuss
17  with you whether she can continue on release.

18          MR. MOORER:  Your Honor, we ask that she be continued
19  under her same conditions.  She has abided by all the terms and
20  conditions and for us to complete the terms of this plea
21  agreement it's necessary for her to be out and about.

22          THE COURT:  Okay.  So there are in your view
23  exceptional reasons why detention would not be appropriate.

24          MR. MOORER:  Yes, Your Honor.

25          THE COURT:  I assume you agree with that, Mr. Teague?

13

1          MR. TEAGUE:  I do, Your Honor.

2          THE COURT:  Based on my knowledge of this case I will

3    find pursuant to 18 U.S.C. Section 3145(c) that there are

4    exceptional reasons why the Defendant's detention would not be

5    appropriate and that the Defendant is not likely to flee or pose

6    a danger to any other person or the community pending imposition

7    of the sentence, therefore I will order that you be released and

8    continued under the same conditions that were imposed on January

9    29th, 2004.  Let me just remind you that failure to appear for

10   sentencing is a criminal offense for which you could be

11   sentenced to imprisonment and that all the conditions on which

12   you were released up to now do continue to apply, and that the

13   penalties for violating those conditions can be severe; do you

14   understand that?

15          THE DEFENDANT:  Yes, Your Honor, I do.

16          THE COURT:  We will see you back here for sentencing.

17   Thank you.

18          MR. MOORER:  Thank you, Your Honor.

19      (At which time, 3:33 p.m., the hearing was adjourned.)

20                 * * * * * * * * * *

21              COURT REPORTER'S CERTIFICATE

22          I certify that the foregoing is a correct transcript

23   from the record of proceedings in the above-entitled matter.

24          This 23rd day of January, 2007.

25                        /s/ James R. Dickens
                          Official Court Reporter

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

UNITED STATES OF AMERICA

vs.                    CR NO: 04cr-25-MEF

AMY ANN PITTS,

\* \* \* \* \* \* \* \* \* \*

SENTENCE HEARING

\* \* \* \* \* \* \* \* \* \*

Before the Honorable Mark E. Fuller,

United States District Judge, at

Montgomery, Alabama, on January 31, 2006

\* \* \* \* \* \* \* \* \* \*

APPEARANCES:

FOR THE GOVERNMENT:    Terry F. Moorer,
                       Assistant United States Attorney

FOR THE DEFENDANT: Barry E. Teague,
                   Attorney at Law

---

**2**

EXAMINATION INDEX

JOE HERMAN
   DIRECT BY MR. MOORER            24
   CROSS BY MR. TEAGUE             34
   REDIRECT BY MR. MOORER          46

AMY PITTS
   DIRECT BY MR. TEAGUE            48
   CROSS BY MR. MOORER             53

DAVID PRICE
   DIRECT BY MR. MOORER            56
   CROSS BY MR. TEAGUE             64

JOE HERMAN
   DIRECT BY MR. TEAGUE            69

AMY PITTS
   DIRECT BY MR. TEAGUE            70
   CROSS BY MR. MOORER             73

EDWARD BUSH
   DIRECT BY MR. TEAGUE            80

GOVERNMENT
EXHIBIT

C

---

**3**

(The above case coming on for hearing at Montgomery, Alabama, on January 31, 2006, before the Honorable Mark E. Fuller, United States District Judge, the following proceedings were had commencing at 11:45 a.m.:)

THE COURT: The Court calls the case of United States of America versus Amy Ann Pitts, case number 04cr-25, filed in the United States District Court for the Middle District of Alabama, Northern Division. Is the United States prepared to go forward with sentencing?

MR. MOORER: Yes, Your Honor.

THE COURT: Is the defense prepared to go forward?

MR. TEAGUE: We are, Your Honor.

THE COURT: I understand there are objections to the presentence report, so if you would, Ms. Pitts, you can stand at counsel table with your attorney. Ms. Pitts, today the Court will determine a reasonable sentence in your case by considering the United States sentencing guidelines which were promulgated pursuant to the Sentencing Reform Act of 1984, and which are now advisory, and by considering the factors set forth in 18 United States Code Section 3553(a). It appears in this case that there had been a plea agreement, and that by conduct that it has been alleged to have been committed by you, Ms. Pitts, that the plea agreement that was reached between yourself and the United States has been revoked. Is there any argument as to that point, first of all?

---

**4**

MR. TEAGUE: Your Honor, they have sought to rescind it, and the Court has not ruled on that. We would ask the Court to look beyond that motion and look at what the government has represented to the Court she has done with regard to the motions for downward departure and the motions for acceptance of responsibility, particularly the downward departure, Judge, we would ask the Court to look at those things. And we would ask -- beseech the Court not to rescind the agreement. However, we do understand that there are other things that have occurred that would cause that agreement not to be honored in full.

THE COURT: Is there any argument or dispute that Ms. Pitts violated the terms of her plea agreement, specifically paragraph (4)(J), of the plea agreement?

MR. TEAGUE: Judge, I have so many documents here, if you would bear with me just a moment.

THE COURT: Take your time.

MR. TEAGUE: What page does that appear on?

THE COURT: On page eight. I will read it for the record. In part it says the Defendant further understands that if the Defendant has failed or should fail in any way to completely or to -- should fail in any way to fully or to fulfill completely the Defendant's obligations under this agreement, including, but not limited to committing any new state or federal criminal offense while awaiting sentencing, then the government will be released from its commitment to

5

1  honor all of its obligations to the Defendant without the
2  Defendant being able to withdraw his, and it should say her,
3  guilty plea. The determination of whether the Defendant has
4  breached this plea agreement by failing to fulfill the
5  Defendant's obligations herein will be at the sole discretion of
6  the government.
7      MR. TEAGUE: Your Honor --
8      THE COURT: Let me ask first, did the Defendant
9  understand that was contained in the plea agreement when she
10  entered the plea agreement in this case --
11      THE DEFENDANT: Yes, Your Honor.
12      THE COURT: -- back in April of 2005?
13      MR. TEAGUE: Your Honor, I would like to add a footnote
14  to that. And if I could, Your Honor, while we are on that
15  subject, our objections were more fully set out in a letter
16  addressed to Officer Caple, dated October 3, 2005. I would like
17  to tender that to the clerk if it please the Court so that it
18  would have the objections we had at that time, we would like
19  to -- for the Court to have those in writing.
20      THE COURT: I have the objections. What I would like
21  to establish first is, is there a plea agreement? If there is a
22  binding plea agreement, if the Court is to consider a sentence
23  outside of the 36 month sentence, then your client, of course,
24  would have an opportunity to withdraw her plea of guilty. Or if
25  she has violated the terms of the plea agreement then the

6

1  government it appears has the option to withdraw from the plea
2  agreement while binding the Defendant to her plea of guilty that
3  she has entered in this case.
4      MR. TEAGUE: Your Honor, based on the strict terms she
5  has already acknowledged to the Court that she did.
6      THE COURT: Okay. So, it is understood that there was
7  a binding plea agreement under Rule 11(c)(1)(C), and there is no
8  disagreement that Ms. Pitts involved herself in conduct which
9  arises to the commission of a new state or federal criminal
10  offense while awaiting sentencing.
11      MR. TEAGUE: That's correct, Your Honor.
12      THE COURT: Mr. Moorer, is there anything or any
13  argument from the United States?
14      MR. MOORER: Yes, Your Honor. She did, in fact,
15  violate the terms of the plea agreement. Just by way of
16  background for the Court because some things that occur in the
17  course of a case, of course, occur outside the presence of the
18  Court. I had a conversation with Ms. Pitts after I had been
19  assigned to prosecute this case. The original plea agreement
20  had been worked out between Mr. Teague and Mr. Brown in my
21  office that she would receive a sentence of 36 months. During
22  the course of our meeting with her -- my meeting with her, she
23  wanted to try to get some further reduction in her time based
24  upon things that she felt she could do or would do. I explained
25  to her that I thought that the 36 months sentence that she got

7

1  originally was too lenient, but that the agreement had been made
2  and that our office was obligated to honor our previous
3  commitment to her, and that if she did do things to assist us
4  that would be taken into account in further reductions if she
5  did things that justify that.
6      Subsequent to that conversation Ms. Pitts was found to
7  be in possession of a device to try to beat the drug test. And
8  the way that came about was that we received information from
9  another individual who told us that she was, in fact, continuing
10  to use and abuse drugs, and that she was using a device called a
11  Whizzinator to beat the drug test, and that if we were to call
12  her in unexpectedly they would find a Whizzinator on her person
13  and that they would find narcotics either in her car or in her
14  purse. And that is subsequently what happened. She was called
15  in for an unannounced drug test, they discovered the device,
16  they discovered the methamphetamine in her purse in her car. So
17  I gave notice of the breach to Mr. Teague and we are here today,
18  Your Honor.
19      THE COURT: Based upon the Court's understanding of
20  Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, and
21  the content of the plea agreement that was reached between the
22  United States and the Defendant in this case, the Court finds
23  that the Defendant's plea of guilty was knowing and voluntarily
24  and intelligently entered and negotiated with the United States,
25  and ensuing and intervening conduct has caused the government no

8

1  longer to be bound by the terms of that agreement, thus bringing
2  us to the point of the hearing today where a reasonable sentence
3  under 18 United States Code Section 3553 Subsection (a) will be
4  determined.
5      MR. TEAGUE: Yes, Your Honor.
6      THE COURT: Ms. Pitts, have you and your attorney had
7  an opportunity to review the presentence report before today's
8  date?
9      THE DEFENDANT: Yes, Your Honor.
10      THE COURT: And have you had an opportunity to consult
11  with your attorney about the content of that presentence report?
12      THE DEFENDANT: Yes, Your Honor.
13      THE COURT: I understand, Mr. Teague, that there are
14  two objections that you have to various paragraphs of the
15  presentence report. Are there -- and for the purposes of the
16  record, they are contained in the addendum to the presentence
17  report in paragraph seven and eight. And your second objection
18  is contained in paragraph 12. Are there any other objections
19  other than those two objections, Mr. Teague?
20      MR. TEAGUE: Your Honor, I am looking for the
21  addendum. Are you looking at the presentence report that was
22  revised September 22, 2005?
23      THE COURT: Yes, I am looking at the addendum to that
24  report.
25      PROBATION OFFICER: I have an extra copy if he would

**9**

1  like one.

2      MR. TEAGUE: I would.

3      PROBATION OFFICER: (complies)

4      MR. TEAGUE: Your Honor, while it's termed an

5  objection, it's just a plea to the Court to take a special view,

6  I submit, under the provisions that the United States Code at 18

7  U.S.C. 3553 encourages the Court to look at. So, it's an

8  objection that that may not be a proper term, Your Honor, it's

9  just an appeal to the Court as to how to view the matter, given

10  the situation we are in right now.

11      THE COURT: And I suppose that it's further argument in

12  support of the pending motion for substantial assistance, or

13  reduction for substantial assistance under Section 5K1.1?

14      MR. TEAGUE: I think that would be a fair way to sum it

15  up, Your Honor.

16      THE COURT: Then do you wish to for the purposes of

17  this record withdraw the objection that's listed in the addendum

18  to the presentence report and just make that as part of your

19  argument in support of the amount of time that the Court should

20  consider for the Defendant's substantial assistance?

21      MR. TEAGUE: Yes, Your Honor.

22      THE COURT: The Court will --

23      MR. TEAGUE: I put it in there because, you know,

24  that's what we call it when we have a response.

25      THE COURT: I understand.

**10**

1      MR. TEAGUE: But I don't think it's fairly called an

2  objection, it's just a --

3      THE COURT: Then the Court will not consider the

4  paragraphs in the addendum to the presentence report contained

5  in paragraph seven and eight listed as objection number one as

6  an objection. Do you persist in objection number two, which is

7  to paragraphs 14 and 22 and the two point enhancement for

8  obstruction of justice?

9      MR. TEAGUE: Your Honor, I have read the Wetherell

10  case, I think I misread it at first. The facts are not anything

11  like this case. There a Magistrate Judge had ordered the

12  woman -- the Defendant to report to a -- I think an in-house

13  facility and she didn't. But at the end of the Wetherell

14  decision the Court talks about all of the things that can

15  constitute obstruction of justice. What I had adjusted my

16  glasses to was, well, did Amy tell them any lies as to what she

17  told them in the proffer sessions, as far as the proffer

18  sessions went. I felt like she had not and I thought it was not

19  necessarily material. However, I do -- after reading the last

20  paragraph of the Wetherell case, I have decided that based upon

21  what the 11th Circuit said there there's no question that it

22  would be obstruction of justice and the Court would have to

23  consider a couple of points there.

24      THE COURT: Are you withdrawing that objection as well?

25      MR. TEAGUE: If it please the Court, yes, sir.

**11**

1      THE COURT: Based upon representation of counsel and

2  there being no objections to the presentence report, the Court

3  adopts the factual statements contained in the presentence

4  report, with the specific findings under the guidelines that the

5  offense level is 42, the criminal history category is I, the

6  guideline range is from three hundred and 60 months to four

7  hundred and 80 months. The supervised release period is from

8  four to five years, and the fine range is from 25 thousand

9  dollars to two million dollars. Also pending before the Court

10  is -- or are two motions, and I will take the first motion as

11  the original motion for the third point for acceptance of

12  responsibility. Is it the government's position that that

13  motion should be withdrawn or should have been withdrawn?

14      MR. MOORER: Yes, Your Honor, in light of what she did

15  subsequent to the filing of the motions. When we filed our

16  notice of the breach of the plea agreement we felt that also

17  implicated her acceptance of responsibility, and therefore she

18  is not entitled to her reduction for acceptance of

19  responsibility. It's our position, Your Honor, that Ms. Pitts

20  did do some things that were helpful to the United States.

21      THE COURT: And I will focus on the 5K motion at the

22  appropriate time, I want to take the motions for the acceptance

23  of responsibility up independent from the substantial

24  assistance.

25      MR. MOORER: Yes, Your Honor.

**12**

1      THE COURT: Is there any argument as to the removal not

2  only of the third point but of all of the points for acceptance

3  of responsibility that would be attributable to Ms. Pitts should

4  she have not violated the terms and conditions of her supervised

5  release?

6      MR. TEAGUE: Your Honor, I would hate to argue that

7  it's appropriate to take that away from her because the idea of

8  at least the two points for acceptance of responsibility is

9  saving the government some of the hassle of having to prosecute

10  her. They did not have to do that. And as the 5K1.1 motion

11  shows she went far beyond that and was considerable assistance

12  to them in -- particularly as we have outlined helping cut some

13  of the supply sources out of Atlanta that plagued the Montgomery

14  community. I realize that there's much to be said about

15  acceptance of responsibility, and when you in another sense

16  obstruct justice you do have some points added. Judge, I am

17  inclined to say that she should not have every point taken away

18  from her for acceptance of responsibility because much of the

19  rationale for the two points, she did provide. She didn't put

20  the government to trial. However, you know, I realize the Court

21  has got a situation where it must rule on the strict terms of

22  the law.

23      THE COURT: While it's strictly within the United

24  States' discretion to ask for the third point for acceptance of

25  responsibility, and I understand the government's motion to

13

1 withdraw that motion at this point, while Ms. Pitts has put
2 herself in a precarious situation by the conduct which occurred
3 after her second release from custody, I find that she should be
4 entitled to one point for acceptance of responsibility, and I
5 will add that to the calculations of a reasonable recommended
6 sentence under the sentencing guidelines, and attribute one
7 point credit for acceptance of responsibility.
8     MR. TEAGUE:  Thank you, Your Honor.
9     THE COURT:  Also, there is pending before the Court a
10 motion for downward departure pursuant to Section 5K1.1 for
11 substantial assistance.  For the record that is document number
12 92.  I will hear argument or I will hear first testimony or
13 proffer from the government in support of the motion for
14 substantial assistance.
15     MR. MOORER:  Your Honor, the position of the government
16 is that the Defendant did provide substantial assistance to the
17 United States during the time that she was cooperating with the
18 United States.  She gave information that led to the indictment,
19 arrest, conviction and sentencing of some other individuals who
20 were involved in the trafficking of ice methamphetamine here in
21 the Middle District of Alabama and elsewhere.  Our problem was
22 that when she breached the plea agreement that it cut us off
23 from doing further things with her.  And though I feel that she
24 should not be given the benefit of the original plea agreement
25 that she bargained for with the United States, I think under the

14

1 guidelines as they are calculated presently attributing all the
2 drugs to her, she would be looking at a 360 to life sentence.
3 And I feel that in light of what she did do for us during the
4 time that she was cooperating that that would not be an
5 appropriate sentence either.  The Court will, of course, have to
6 make the determination as to what an appropriate sentence is,
7 but it's between those two extremes.  The Defendant, though, has
8 not -- is not going to in my opinion be somebody though that
9 will be someone that we might call at a future trial or used to
10 further other investigations of because of her conduct post her
11 having violated the terms of the plea agreement.
12     THE COURT:  Because you feel her credibility is now at
13 stake?
14     MR. MOORER:  Yes, Your Honor.  Because if we put her on
15 the stand one of the things that we typically are able to do
16 when an individual is cooperating with the United States is to
17 be able to note to the jury yes, this individual is somebody
18 that they have to consider their testimony with caution and
19 great care but she has admitted truthfully to the things she has
20 been involved in, she has told us things that the Defendant has
21 been involved in, and those things are corroborated by other
22 things.  And she has continued from the time that she
23 acknowledged what she did and what these other people did to
24 continue to assist us.  And yes, she is going to be rewarded
25 based upon that and you should believe this individual because

15

1 of these factors.  And her having essentially double-dealt the
2 United States opens her up to a line of questioning that
3 seriously undermines her credibility in front of a jury.
4     A person who is an informant or working to reduce
5 charges that they are facing, the Court gives a standard charge
6 in every case that their testimony has to be considered with
7 great caution and care, more so than any other witness who might
8 testify in the matter.  And when you add on top of that that an
9 individual has essentially been untruthful, not by her
10 statements but by her failing to reveal certain things such as
11 the way she tested positive was that she obtained drugs from
12 Nicole Broadfoot.  Well, she never told us that she could buy
13 drugs from Nicole Broadfoot, she simply did that on her own
14 after her cooperating with us.  So she would naturally be open
15 to a line of questioning that we can't defend by defense counsel
16 in a future case that she might be called in because the cross
17 would go along the lines that well, you didn't tell them about
18 that, what else are you not telling them about?  It lays that
19 inference that we can't really defend against.
20     THE COURT:  But as an officer of this Court are you
21 making representations that some of the information that she
22 provided does amount to substantial assistance in the aid of
23 prosecuting others who have already been sentenced by this Court
24 or are in the process of going through either a guilty plea or a
25 sentence?

16

1     MR. MOORER:  She did, Your Honor.  She provided
2 information about Dewan Arvin who was prosecuted and sentenced
3 by this Court.  And he received I believe a 20 year sentence.
4 And she provided information about people like Nicole -- not
5 Nicole Broadfoot, I'm sorry, but about other individuals who
6 have been prosecuted in this case.
7     MR. TEAGUE:  Jake Melton, Jeremy Mann.
8     MR. MOORER:  Other individuals who have been
9 prosecuted.  And I think in fairness to the Court, as an officer
10 of the Court she did some things to assist our investigation,
11 and our position has been since she did breach the plea
12 agreement is not that she is not entitled to some consideration
13 but a 36 month sentence is too lenient.  I felt it was too
14 lenient to begin with but it was the deal I was stuck with, but
15 I think three hundred 60 months on the other hand is not a
16 reasonable sentence either.  Somewhere between the two extremes,
17 Your Honor, is where a reasonable sentence lies.
18     MR. TEAGUE:  Your Honor, could I be heard?
19     THE COURT:  You can, but out of an abundance of
20 precaution let me make sure I advise your client properly of the
21 proper offense level and the recommended guideline range after
22 having taken into consideration the one point for acceptance of
23 responsibility.  Ms. Caple, if you would assist me in making
24 sure I state this accurately.  And then I will give you an
25 opportunity, Mr. Teague, to respond to the motion for 5K1.1

17

1  substantial assistance.

2           Having made the factual findings as to your acceptance

3  of responsibility and after having calculated the one point that

4  would be attributable to you for your assistance in saving the

5  government time and resources in having to prosecute you,

6  Ms. Pitts, and with the other factual statements contained in

7  the presentence report to which there is no objection, the Court

8  makes a specific finding under the guidelines that the offense

9  level should be 41, the criminal history category remains as a

10  category I, the guideline range is three hundred 24 months to

11  four hundred and five months, the supervised release period

12  remains from four to five years. And Ms. Caple, correct me if I

13  am wrong, the fine range would still remain 25 thousand to two

14  million dollars?

15           PROBATION OFFICER: Can I approach just for a minute on

16  the 3E1?

17           THE COURT: Yes, ma'am.

18           (At which time an off-the-record discussion was had

19  between the Court and the probation officer.)

20           THE COURT: As I have been corrected under 3E1.1,

21  Ms. Pitts, you are entitled to either two points for acceptance

22  of responsibility, or at the sole discretion of the government,

23  three points for acceptance of responsibility, or based upon the

24  discretion of the Court and your subsequent conduct, zero points

25  for acceptance of responsibility. The Court considers your

18

1  having saved the government its time and resources in

2  prosecuting you as an indication that you should be afforded two

3  points for acceptance of responsibility. With that finding,

4  under the guidelines the offense level is a level 40, the

5  criminal history category remains a criminal history category

6  I. The guideline range is from two hundred 92 months to three

7  hundred and 65 months. The supervised release period is from

8  four years to five years, and the fine range is from 25 thousand

9  to two million dollars. Is that right, Ms. Caple?

10           PROBATION OFFICER: That is correct.

11           THE COURT: All right. Mr. Teague, now I will hear any

12  testimony or argument that you might have in response to the

13  government's motion for its 5K1.1 motion for substantial

14  assistance at this time.

15           MR. TEAGUE: Your Honor, I do appreciate so much the

16  forthrightness of Mr. Moorer. He may be surprised to hear that

17  after other things I have said to him, but he -- I think we

18  agree too, Judge. We have -- at one time, you know, I have

19  argued that we had that 36 months deal in the bank. Subsequent

20  behavior can not be overlooked, you know, we understand that.

21  We are resigned to whatever punishment the Court may deem

22  appropriate.

23           Now, with regard to Nicole Broadfoot though I would

24  reason with Mr. Moorer that the -- Nicole Broadfoot exposed my

25  client, and it was at that point my client -- Agent Herman, I

19

1  believe, would agree -- wanted very much to take Nicole

2  Broadfoot off the street. My client gave considerable

3  information, and the 5K1.1, Your Honor, had not yet been filed.

4  She had not yet been placed in jail as of August 30th for that

5  violation of the Whizzinator. Now, she told Agent Herman

6  exactly how to find an accomplice of Nicole Broadfoot in the

7  City of Auburn, and told them exactly what vehicle to look for

8  and what motels to go to. And they went over there and they

9  found that very vehicle. They were able to bring down then

10  Nicole Broadfoot and the other person, two of whom -- those two

11  are here today to testify on behalf of the government if

12  necessary. So, Your Honor, we say that with that footnote added

13  we did give some information to the government that helped them

14  to arrest her. So, we want to be sure the Court understands

15  that because I realize the Court is getting all this fairly new

16  and fresh.

17           THE COURT: Well, the Court does understand, and

18  certainly takes judicial notice of the one case at least that

19  the Court is aware of. And Mr. Moorer, correct me if I am

20  mistaken in the identity of the Defendant who has already been

21  sentenced, is it Mr. --

22           MR. MOORER: Dewan Arvin.

23           THE COURT: Dewan Arvin?

24           MR. MOORER: Yes, Your Honor.

25           THE COURT: And as I understand it Mr. Arvin was

20

1  alleged to have been the supplier of some of these drugs that

2  Amy Pitts has been accused of transporting and distributing back

3  in Montgomery?

4           MR. MOORER: Yes, Your Honor. Just by way of

5  background, Mr. Arvin and a couple of other individuals have

6  been identified during the course of this overall investigation

7  which targeted Ms. Pitts as being the major sources for the size

8  that was supplied to this group of people here in the Middle

9  District. And Mr. Arvin received I believe a 20 year sentence

10  some months back by this Court.

11           THE COURT: And your testimony or your proffer to the

12  Court for the record is that information that Ms. Pitts provided

13  to the government was beneficial in the prosecution of Mr. Arvin

14  in that case?

15           MR. MOORER: It was beneficial in Mr. Arvin's case and

16  the prosecution of some other individuals who have been

17  prosecuted since.

18           THE COURT: I want to relate to Mr. Arvin specifically

19  because, of course, he is the one I am most familiar with in

20  this ice ring.

21           MR. MOORER: Yes, sir.

22           THE COURT: Do you have any other testimony or argument

23  in support of the 5K motion that's been filed in this case?

24           MR. TEAGUE: One moment, Your Honor. Well, Judge, I

25  don't know whether you would consider it on that or not but she

21

1  was continuing to try to find other people because she did
2  desperately want to get that 36 months down if possible. She
3  did, without knowledge of the fact that David Price, known on
4  the street as Putt-Putt, had already given information against
5  her. In fact, I don't think he had given the information.
6      She sat down as recently as December the 7th in jail
7  with me and Agent Herman and she acknowledged that the
8  Whizzinator that she got was provided to her by David Price.
9  Now, at that time she did not know that David Price had -- well,
10  in fact, I don't think he had given his statement at that time.
11  That was later in December if I remember the DEA-6.
12  And -- okay. All right. Your Honor, I stand corrected, my
13  client has corrected me. He had given his statement in late
14  November and she straightened the matter of the Whizzinator out,
15  and where she got it, she straightened that out on December the
16  7th according to my notes.
17      So, in a sense there was some continuing cooperation
18  under -- not under the circumstances that you would normally
19  consider in a 5K1, but she did -- and I was there, in fact, on
20  two occasions, one time with Agent Herman and Agent Hurst, where
21  a lot of names that were brand new to me came out. And I think
22  they were -- they are things, information that could be helpful
23  to them.
24      Now, Your Honor, I want to take a couple of minutes to
25  talk about what Mr. Moorer has said about making Amy Pitts to be

22

1  unusable as a witness in this case. As you know, I don't have
2  this white hair for nothing. I have been around these courts
3  for 30 some odd years as an attorney. One of the biggest
4  cocaine rings that was ever brought down in this District was
5  the case known as Oscar Flowerman Andrews. They prosecuted
6  anywhere from ten to 12 Defendants in three different ways.
7  Just so happened I defended the man in Oscar Andrews part one
8  and part three. In both of those cases the government called a
9  man who had already been to the penitentiary, as was conducted
10  in court today, and was cross-examined by Frank Rubino. I
11  remember the lawyer who defended Manuel Noreiga. He was in that
12  case with us, he cross-examined some of the government's
13  witnesses and had them acknowledge yeah, we lied to probation
14  officers every week, and the jury went right on and accepted
15  their testimony and convicted.
16      Now, if Mr. Moorer doesn't want to use Amy Pitts, you
17  know, that's one thing. But I believe as a good, effective
18  prosecutor as I think he is, she still can be used. And Judge,
19  if you will give me a few minutes to talk to him some day soon I
20  will talk him into using her yet.
21      THE COURT: I don't think I heard him say he was not
22  inclined to use her, I think what he said, at least in the
23  Court, is obviously her credibility would be at issue where
24  otherwise it might not have been open to.
25      MR. TEAGUE: Then Judge, I would apologize to

23

1  Mr. Moorer and the Court, I misunderstood him. I thought he
2  said he just felt he could never use her again and I just wanted
3  to reason with the Court and Mr. Moorer.
4      THE COURT: I want to make sure I understand that too.
5  That's not your position, is it, Mr. Moorer? I think your
6  position is that her credibility is at issue and not the fact
7  that you don't ever intend on having to call her.
8      MR. MOORER: Her credibility is greatly at issue. And
9  Your Honor, I was at the appropriate time going to call my agent
10  to testify that there are matters that he is now currently
11  investigating that we believe there's a connection between the
12  Defendant and some other individuals whom she has not told us
13  about, and we have not even asked her about it because of her
14  conduct since she has been cooperating, where we found out that
15  she was using drugs, et cetera, we don't even want to ask her
16  about because it would compromise what we have got going. So we
17  definitely can't use her in that regard. There may be others.
18  I think the things that she could have done that would have
19  required the jury to accept her credibility have been done, and
20  that's why I have said that she is entitled to a 5K to a certain
21  extent, but further proactive cases that we might bring, I can
22  not envision calling her to the stand.
23      THE COURT: Well, at this point in the proceedings I am
24  going to hear all that you have to offer in support of or in
25  opposition to your 5K motion, if there's any testimony that

24

1  you wish to offer for the Court's consideration of what amount
2  of substantial assistance that Ms. Pitts has provided, you can
3  do that at this time. And Mr. Teague, you and your client can
4  be seated if there's going to be witnesses called.
5      MR. MOORER: Yes, Your Honor. The United States calls
6  Officer Joe Herman.
7      MR. TEAGUE: Your Honor, may Mr. Moorer and I approach
8  the Court for just a second?
9      THE COURT: You want this on the record?
10      MR. TEAGUE: No.
11      (At which time a side-bar conference was had between
12  the Court and counsel, which conference was not attended by the
13  court reporter.)
14      THE COURT: You may swear the witness.
15      THE CLERK: You do solemnly swear or affirm that the
16  testimony you give in this cause to be the truth, the whole
17  truth, and nothing but the truth, so help you God.
18      THE WITNESS: I do.
19      THE COURT: You may proceed.
20      MR. MOORER: Yes, Your Honor.
21      JOE HERMAN, witness for the Government, having
22  been duly sworn or affirmed, testified as follows:
23          DIRECT EXAMINATION
24  BY MR. MOORER:
25  Q. For the record would you state your name, please.

25

1  A. Joe Herman, H-E-R-M-A-N.

2  Q. What do you do for a living, Mr. Herman?

3  A. I am an agent for the Alabama Bureau of Investigation

4  assigned to the Montgomery HIDTA task force.

5  Q. Did you in your official capacity engage in an investigation

6  in which we have code named Operation Avalage?

7  A. I have.

8  Q. In the course of that investigation did you at some point

9  target Amy Pitts?

10  A. We did.

11  Q. After you targeted Amy Pitts were you able to enlist her

12  cooperation in furthering your investigations with -- towards

13  other targets?

14  A. Yes, we did.

15  Q. And were you able to use her assistance in furthering your

16  investigations towards other targets?

17  A. We did.

18  Q. Would you briefly describe how it was that she was helpful

19  to you.

20  A. Initially, by way of proffer, she provided a good bit of

21  historical information about potential co-Defendants and

22  associates, and source of supply that was already -- so that she

23  corroborated a lot of information that we had. She was able to

24  make two controlled drug buys from Dewan Arvin in Atlanta where

25  we actually took her to Atlanta and bought dope from Dewan

26

1  Arvin, where he was later prosecuted here in the Middle District

2  of Alabama.

3  Q. Now, in the course of that, did you get information from her

4  related to other individuals?

5  A. Yes, we did.

6  Q. At some point thereafter did you decide to point your

7  investigation towards an individual by the name of Nicole

8  Broadfoot?

9  A. Nicole Broadfoot has been on the radar screen for quite a

10  while, yes.

11  Q. And was this -- was she a target prior to Ms. Pitts

12  cooperating with you?

13  A. Yes.

14  Q. And had you, in fact, developed a case that -- against

15  Nicole Broadfoot that you were planning to bring independent of

16  Ms. Pitts?

17  A. Yes, we did.

18  Q. At some point did you move quicker towards bringing a case

19  towards Ms. Broadfoot than you otherwise would have?

20  A. Yes, we did.

21  Q. Would you explain to the Court how that came about?

22  A. Sometime in late June, I think it was a Sunday, Amy Pitts

23  called my cell phone and alerted me to the fact that Nicole

24  Broadfoot was accessing PACER -- the PACER Web site. And what

25  she was doing was she was downloading and printing off copies of

27

1  plea agreements, cooperation agreements and passing them around,

2  and it was getting around. And one of the people that she

3  printed off was Amy Pitts' plea agreement where it said she will

4  provide substantial assistance.

5    So based on that information, in fact, that same day I

6  talked to Terry Moorer, my AUSA, and we sought a complaint just

7  to get her picked up. I think it was July 3rd. There was an

8  arrest made in Auburn on July 2nd, and some of my Auburn

9  partners gave me a call and we picked up some cell phone text

10  messaging and some messages that indicated that Nicole Broadfoot

11  was at the -- somewhere at a hotel in Auburn. And I called the

12  Auburn detectives and they were looking for a particular car

13  that she probably would be in or associated with and they

14  found that car at the Econo Lodge and later on that night we

15  arrested Nicole.

16  Q. And after her arrest did Nicole Broadfoot agree to cooperate

17  with you in the investigation you were doing at that point?

18  A. She provided a proffer interview with her attorney where she

19  gave us some more information about potential Defendants and

20  Defendants that we were waiting to indict.

21  Q. Did she give you any particular information about Ms. Pitts'

22  activities since Ms. Pitts had been on bond?

23  A. Yes. She told me that she had sold Amy methamphetamine, and

24  that she was using an associate by the name of Erica Stillwell

25  to deliver the methamphetamine to Amy up at her father's house

28

1  where she was living under electronic monitoring.

2  Q. And did she indicate to you how Ms. Pitts might be avoiding

3  detection in the urinalysis test?

4  A. Yes. When I asked her, I asked her -- I asked Nicole

5  Broadfoot if Amy Pitts was using methamphetamine, and she said

6  yes. I asked her how she is passing her urine tests and she

7  said she is using a Whizzinator, which is a device used to pass

8  urine or fake urine in the urine test by the probation office.

9  She also said that she would have methamphetamine and it would

10  be in one of three places, be in her eye glass case and the eye

11  glass case would be in her center console or up above the

12  visor. I called Bernard Ross and indicated that to him and it

13  took a couple of days for him to call Amy Pitts in and she did

14  fail the urine test and they did find the methamphetamine in an

15  eye glass case that was in her car.

16  Q. And did they find a Whizzinator as well?

17  A. They did.

18  Q. Now, subsequent to the detection of these items have you

19  been continuing to target other individuals involved in the

20  narcotics trade here in the Middle District and elsewhere?

21  A. Yes, we have. We actually spun off from Operation Avalage

22  to a companion investigation, and we have identified some

23  significant Defendants or potential Defendants.

24  Q. And did you at some point come to believe that there was a

25  connection between those targets and Ms. Pitts?

29

1  A. There --
2  Q. And I am not asking what the connection was, but did you --
3  A. Yes, we did.
4  Q. And based upon the subsequent conduct, that is, her
5  continuing to use methamphetamine and to use devices to evade
6  the detection by the probation office, have you even asked her
7  about these other targets that you developed that you feel is
8  somehow connected to her?
9  A. We are not going to talk to her about it.
10  Q. Now, did you develop other information about Ms. Pitts and
11  her relationship with David Price?
12  A. Yes, we did.
13  Q. Now, correct me if I am wrong, but I believe Ms. Pitts is
14  married to a person who is a cousin of Mr. Price?
15  A. Yes, she is married to Tommy Wadsworth who is David Price's
16  first cousin.
17  Q. Did you have occasion to interview Mr. Price after you
18  targeted him in your investigation as well?
19  A. Oh, yes.
20  Q. And Mr. Price, was he subsequently charged and convicted?
21  A. He has been charged, he hasn't been convicted.
22  Q. Now, did you have occasion to talk with Mr. Price about his
23  relationship with Ms. Pitts beyond just their family
24  relationship?
25  A. I have.

30

1  Q. And did you find information in the course of your
2  investigation related to their relationship beyond the family
3  relationship, did you conduct further investigation related to
4  their relations?
5  A. Are we talking all the way back to 2002 or --
6  Q. Let me ask this a different way.
7  A. Please.
8  Q. Did you develop information in your investigation that
9  caused you to believe that she was somehow trying to get
10  Mr. Price not to give certain information to you?
11  A. Yes.
12  Q. And would you tell the Court what you found out and how that
13  came about?
14  A. When Amy Pitts was incarcerated in the Autauga County Jail I
15  went up and listened to some of her calls that were placed from
16  the jail phone to her father's phone and also to her husband's
17  phone at his Sunset Drive address after he moved down from the
18  lake house. And in that -- in those calls, specifically one on
19  the 27th of November I think it was when she was -- called her
20  husband and was pretty -- I don't know if frantic is a good
21  word, pretty excited that she had to have her husband find out
22  from David Price what he was going to say because then I think
23  the word she used, this could pop up here any time and I have
24  got to know what to say. Additionally, I found through one of
25  the calls, and the way it appeared to me was she was sending

31

1  messages out of the jail by way of letters.
2      MR. TEAGUE: Excuse me, Your Honor, I would like to
3  object to the way it appeared to him. I would rather he give
4  the Court purely what was said rather than his interpretation.
5  Q. Just tell the Court what was said and what you concluded.
6      THE COURT: The objection is sustained.
7      MR. TEAGUE: Thank you, Your Honor.
8  A. I found that Amy had written David Price a letter.
9  Q. And I am going to stop you right there and show you what I
10  have previously provided to defense counsel as Government's
11  Exhibit 1, and if you will, put it on the lectern.
12      MR. TEAGUE: Your Honor, we would stipulate to save
13  Mr. Moorer a little time that it is a letter written by my
14  client and we would acknowledge that she wrote it. And the
15  authenticity of it.
16      THE COURT: Is there a date on that letter?
17      MR. MOORER: Your Honor, it's dated 11/22/05.
18  Q. What is Exhibit 1 here?
19  A. Yes, sir.
20  Q. Is this the letter that you are referring to?
21  A. That's a copy of it. The original is in David Price's
22  client file with his attorney.
23      THE COURT: Any objection to Government's Exhibit 1 for
24  the purposes of this hearing?
25      MR. TEAGUE: No, Your Honor.

32

1      THE COURT: Without objection, Government's Exhibit 1
2  is admitted.
3  Q. And this letter said in substance what, Mr. Herman?
4  A. I really can't -- could I look at it, please?
5      MR. MOORER: Yes. Your Honor, if I may approach him
6  too.
7      THE COURT: You may.
8  Q. (complies)
9  A. Thank you. The letter in substance says that she is warning
10  David Price that for the record, you know, don't violate the
11  plea agreement, that don't ever do anything, don't ever fail a
12  drug test because the government, we will not be obligated to
13  that agreement. And also, goes on down two sentences later to
14  say that I kept -- that she kept David Price's name out of her
15  interviews. And then it goes on and continues above, I didn't
16  tell them about the Whizzinator.
17  Q. So she talks about not having told you and the other agents
18  about the Whizzinator.
19  A. Right.
20  Q. And did you find some telephone conversations related to
21  that particular letter?
22  A. I did.
23  Q. And would you tell the Court what was said during those
24  conversations related to the letter.
25  A. The call was from Amy Pitts to her husband and she had Tommy

33

1  Wadsworth, her husband, get on a different phone and call David
2  Price. And you could hear in the background Tommy Wadsworth
3  talking to someone. And when he got back on the phone he said
4  that the subject of the Whizzinator -- or he didn't say
5  Whizzinator, but the subject, it didn't come up, he didn't talk
6  to him about it. And that I think was the same call where she
7  was anxious wanting to know what Price had said to us, if
8  anything, because she wanted to know because it could pop up at
9  any time.
10  Q. And I have here Government's Exhibit 2 which is a CD that I
11  have previously provided to defense counsel, which I have got
12  the machine to play it on.
13       MR. TEAGUE: No objection.
14       MR. MOORER: And I offer Exhibit 2 for review by the
15  Court when it chooses to.
16       THE COURT: What is Exhibit 2?
17       MR. MOORER: Your Honor, it is a CD, it contains about
18  eight telephone calls. Some of the calls are 15 minutes to 20
19  minutes and then I don't think we need to -- I don't intend to
20  play those calls at this point because he's testified in
21  substance as to what was said, I think about the important
22  calls. But that is what Exhibit 2 is, Your Honor.
23       THE COURT: Any objections to the admissibility of
24  Government's Exhibit 2?
25       MR. TEAGUE: No, Your Honor.

34

1       THE COURT: Without objection, Government's Exhibit 2
2  is admitted.
3  Q. Agent Herman, are there other individuals that -- well, let
4  me back up. I believe you said earlier that she gave you
5  information about individuals who she was involved in the
6  methamphetamine trade with?
7  A. That's correct.
8  Q. And have those individuals whom she gave us information
9  about been prosecuted by this office or other offices?
10  A. Some have, some are still awaiting prosecution to be
11  indicted.
12  Q. But do you foresee her being able to do anything for you
13  proactive or that you would intend to use her for in the future
14  based upon the conduct that she has engaged in post giving you
15  the information about the PACER information getting out?
16  A. No, sir.
17       MR. MOORER: No further questions, Your Honor.
18       THE COURT: Any cross-examination?
19       MR. TEAGUE: Yes, Your Honor.
20              CROSS-EXAMINATION
21  BY MR. TEAGUE:
22  Q. Agent Herman, I just want to be sure I understand. Dewan
23  Arvin's prosecution has brought other information to you as an
24  investigator, has it not?
25  A. Yes, it has.

35

1  Q. And Amy directly made four trips to Atlanta with you to
2  endeavor to get this man brought to justice; is that correct?
3  A. I thought it was three but if you are saying four, yes.
4  Q. She is not sure either, that's why I asked four. But
5  whichever it is, three or four, two of those times she was
6  successful in making buys on a tape recorder with Mr. Arvin; is
7  that correct?
8  A. Right. She bought four ounces from Mr. Arvin on two
9  occasions.
10  Q. So he has been brought to justice, been given a 20 year
11  sentence and he is trying to help you so that he can help
12  himself; is that correct?
13  A. I didn't know what his sentence was, if you say 20 years.
14       THE COURT: For the record, his sentence was a hundred
15  and 68 months.
16       MR. TEAGUE: Excuse me, Judge, I thought I heard 20
17  years.
18       THE COURT: I think that may have been the recollection
19  from Mr. Moorer, but for the record his sentence was a hundred
20  and 68 months.
21  Q. But whatever the sentence, that was not my point,
22  Mr. Herman. As a result of his conviction he is seeking to
23  assist you; is that correct?
24  A. He is pretty much done right now.
25  Q. Right, but he has assisted you, has he not?

36

1  A. Yes, he provided a proffer.
2  Q. And Amy Pitts should be given credit for the fact that she
3  helped you with the single best case you had against Dewan
4  Arvin, to the extent she is being helpful now, she should get
5  some credit for that, should she not?
6  A. Yes.
7  Q. Thank you. Now, Jacob Melton, are you getting any good
8  leads out of that successful prosecution?
9  A. He has been prosecuted and sentenced.
10  Q. Yes, sir. And have you gotten any -- because of his
11  sentencing, have you gotten any leads from that that you are
12  pursuing and able perhaps to make cases on?
13  A. We made the case on Jacob Melton using another informant, in
14  handled-to-hand controlled buys.
15  Q. But my client was helpful in that case also, was she not?
16  A. She mentioned his name in a proffer I believe.
17  Q. How about Jeremy Mann?
18  A. Actually Jacob Melton, she said that a person that she was
19  supplying methamphetamine, Christy Burt, was supplying Jacob
20  Melton, I believe.
21  Q. Okay.
22  A. Jeremy Mann, we made a case on Jeremy Mann using another
23  informant, but she did provide information, yes, she did.
24  Q. And she should get credit for that, should she not?
25  A. I don't have a problem with her getting credit.

37

1  Q. Thank you. And you said Jeremy Mann also, some of that
2  information did you say was helpful in bringing Nicole --
3  helping you formulate a case against Nicole Broadfoot?
4  A. No. Actually we caught Nicole Broadfoot trying to pick up
5  eight ounces of meth along the interstate. Amy provided some
6  historical information about Nicole Broadfoot and she indicated
7  she might be in a particular car when we arrested her, but it
8  was a result of the PACER information.
9  Q. Okay. Now, if one is going to operate as a street
10 informant, it's a good idea to have street credibility, is it
11 not?
12 A. Sure.
13 Q. In other words, to be trusted and to have those --
14 A. Right.
15 Q. And, of course, sometimes the CIs don't make the best of
16 judgments, but Nicole Broadfoot was somebody you did want to
17 nail; is that correct?
18 A. Especially after Amy said she was putting her name out as a
19 result of PACER, yes.
20 Q. But you wanted her even before that, didn't you, as someone
21 who deals methamphetamine?
22 A. Right, we had her, we were just waiting to indict her.
23 Q. All right.
24 A. The reason why we arrested Nicole Broadfoot in July was
25 because of the PACER issues, to protect Amy's --

38

1  Q. Identity?
2  A. Identity, safety, whatever.
3  Q. Safety. But she had already told you about Nicole
4  Broadfoot, even though you had already had other information
5  about her.
6  A. Right.
7  Q. All right. Now, who was the biggest Defendant you brought
8  down in the Investigation Avalage or Operation Avalage?
9  A. Thus far?
10 Q. Would it be Dewan?
11 A. No.
12 Q. Was he pretty big in it?
13 A. Yeah, there's a misrepresentation, not when -- Mr. Moorer
14 said the source of supply for Alabama, thus -- the is not really
15 a good word. We have identified several sources of supply that
16 are responsible for 40, 50 pounds of methamphetamine in a year
17 being brought back into the Middle District. Of one, Dewan
18 Arvin probably is up there around -- off the top of my head 40
19 pounds, but there's another person, probably another one, that
20 are just equal if not greater and as capable of supplying the
21 Middle District of that much methamphetamine.
22 Q. 40 pounds, somebody is -- helps you bring down a 40 pound
23 man that's pretty good size, isn't it?
24 A. Sure.
25 Q. Thank you. Now, Erica, once she was brought down she gave

39

1  you a proffer and she said well, now, let me tell you, I have
2  been supplying -- I think she identified about a ten week period
3  I have been supplying Amy Pitts with an eight-ball or so a week
4  or whatever she said in that DEA-6 interview form, right?
5  A. Right. She said she delivered methamphetamine to Amy
6  somewhere between five and ten occasions.
7  Q. Okay.
8  A. I think it was.
9  Q. Total. And she said that she was charging how much per
10 eight-ball?
11 A. I don't think she said the price. I am thinking it was
12 around three hundred or 280.
13 Q. Nicole?
14 A. But I think Nicole was the one who was charging. All Erica
15 was was just a delivery person because Nicole quite frankly was
16 afraid to get out on the street for fear of us seeing her, you
17 know.
18 Q. I understand. But she was the source, was she not?
19 A. Nicole?
20 Q. Yeah. Even though Erica might have been --
21 A. Yes, Erica was delivering, right.
22 Q. What I am trying to get to, Agent Herman, it was -- she said
23 on about -- a few occasions in this window period she supplied
24 my client with an eight-ball and you recall it being about a
25 three hundred dollar proposition each time?

40

1  A. I am thinking, yes.
2  Q. That's the way I read the DEA-6 which you prepared, did you
3  not?
4  A. Yes, sir.
5  Q. Okay. Now, David Price, you also took an interview or a
6  proffer statement from him and that's reduced to a DEA-6 also,
7  isn't it?
8  A. It is.
9  Q. Now, do you recall that in his DEA-6 David Price said well,
10 during the time, cousin-in-law, Amy was on court supervision, I
11 bought eight-balls from her.
12 A. Uh-huh. (positive response) Yes.
13 Q. Now, you have only identified Nicole Broadfoot as anybody
14 who is supplying her with eight-balls; is that correct?
15 A. Yes.
16 Q. And then if we are to believe what David Price told you, she
17 is not even able to use any methamphetamine, she is just simply
18 taking it and selling to David Price. That wouldn't make sense,
19 would it?
20 A. No. She also -- David Price was also -- when Amy Pitts was
21 on electronic monitoring there was a window there where she
22 eventually found she had some free movement. Some of the free
23 movement was she was going to different motels to meet Nicole
24 Broadfoot, she would go to her address on Lenox where we
25 arrested her, and she would meet or smoke methamphetamine with

**41**

1  David Price. I think it was the second month at Lenox Court
2  when he was living with Charlie or Charshene that he actually
3  purchased methamphetamine from Amy Pitts. I think the first
4  month he was just using, and I believe if I remember my report
5  correctly, he said that Amy had told him that he -- that she was
6  getting it from Nicole Broadfoot.
7  THE COURT: This was after Amy Pitts was originally
8  arrested in January of '04?
9  THE WITNESS: Oh, yeah. What happened was, she was on
10 electronic monitoring and I think she tested positive, then she
11 was released from jail and then this is just this past August of
12 2005 that this was going on while she was on EM going around the
13 town hooking up with David, and, of course, Erica was driving
14 the dope up to the lake.
15 Q. Since the Judge asked that question, Agent Herman, we are
16 not here to say that Amy from the time she was released on the
17 street started using meth from day one.
18 A. Right.
19 Q. Based upon the information you have developed it was only in
20 that period that we are alleging that she fell off the wagon
21 so-to-speak or went astray, based upon the eight-ball she was
22 getting from Nicole Broadfoot during about, what did you say,
23 about a ten week period?
24 A. I am thinking it started --
25 Q. I will bring you those DEA-6s if you want to look at them.

**42**

1  A. I am thinking it started around the May time frame, April or
2  May time period, which would have been a three month period.
3  THE COURT: Of what year?
4  A. 2005. This is after she cooperated with Dewan Arvin and
5  after Dewan has been sentenced and this is recently within the
6  last six months.
7  Q. Excuse me. And then she got bought down August of 2005 so
8  we are talking behavior that brought her to this past is between
9  May and August of --
10 A. 2005.
11 Q. -- 2005.
12 A. Yes, sir, that's correct.
13 Q. All right. And David Price told you that it was in -- David
14 Price only talked about getting methamphetamine from Amy during
15 that same period of time, wasn't it? I realize --
16 A. As the sole source, as Amy being his sole source?
17 Q. I think so.
18 A. I think that's right, yes.
19 Q. Right. But, and he alleges that he bought eight-balls from
20 her, but if he bought eight-balls from her that's what she was
21 getting from Nicole, that would be nothing for Amy to use, would
22 there?
23 A. Unless she is buying more eight-balls on other particular
24 times, I don't know.
25 Q. Or no surprise, David Price could not be totally truthful

**43**

1  with you about that, could he?
2  A. It seems like everything he said thus far checks out pretty
3  good.
4  Q. We don't argue with a lot that he says, but we do argue with
5  that, and that's why I want to ask you about that.
6  A. All I can tell you, Mr. Teague, is that what he said thus
7  far when I look at the letter and the jail calls and about, for
8  instance, the woman painted on his bedroom door as -- Sunset
9  residence that her husband is now living in, the only way she
10 would have known that from the call would be to be there, so I
11 have got to take pretty much what he says as being accurate,
12 sir.
13 Q. You understand, we don't argue with you, we recognize some
14 truth in what he says.
15 A. Right.
16 Q. Now, the -- but you understand as to an allegation that she
17 is selling, you know, just blatant selling during this period of
18 time, we are not ready to totally agree with, and that's what I
19 am trying to get at.
20 A. Okay.
21 THE COURT: Mr. Teague --
22 Q. And there is a --
23 MR. TEAGUE: Yes, Your Honor?
24 THE COURT: -- let me interrupt you. We have got to
25 take a recess because of a matter that my court reporter has got

**44**

1  to cover for another Judge at 1:00 o'clock. I want to get you
2  to a point where we can take a recess and then start back up
3  with your continued cross of Agent Herman, and also accommodate
4  the schedule that Mr. Dickens has with Judge DeMent. So if you
5  are at a point where we can take a recess, why don't we -- I
6  know we have been here a long time this morning, I would like
7  for us to take a recess until 2:00 o'clock.
8  MR. TEAGUE: That will be fine.
9  THE COURT: And then give you an opportunity to
10 continue with your cross-examination of Agent Herman.
11 MR. TEAGUE: I only had a couple more questions, but
12 that --
13 THE COURT: Unfortunately the telephone conference is
14 in two for Mr. Dickens and I don't want to put him in a bind
15 with another District Judge, so if you would, I will ask that
16 you suspend your cross at this time. We will take a recess
17 until 2:00 o'clock.
18 MR. TEAGUE: Thank you, Your Honor.
19 (At which time, 12:59 p.m., a recess was had until
20 2:00 p.m., after which, the hearing continued.)
21 THE COURT: Mr. Teague, are you ready to continue with
22 your examination of this witness?
23 MR. TEAGUE: Yes, Your Honor.
24 THE COURT: I apologize again to you and to your client
25 for having to interrupt the proceedings, but I appreciate your

45

1  indulgence.

2       MR. TEAGUE:  Judge, thank you.

3       THE COURT:  You may continue.

4  Q.  Agent Herman, the -- you knew David Price was -- I think you

5  have already testified was the first cousin to Amy Pitts'

6  husband?

7  A.  Yes.

8  Q.  And do you recall when we did have a session at the Autauga

9  County detention facility where the federal prisoners -- some

10  federal prisoners are kept, and debriefed Amy for a second time

11  after her arrest?

12  A.  There was -- yeah, we debriefed her on two different

13  occasions.

14  Q.  Right.

15  A.  Yes.

16  Q.  And you didn't disclose to her that David Price had been

17  cooperating or anything like that, did you?

18  A.  Did not, no.

19  Q.  And I was present there in that conversation and I heard

20  everything that was said, did I not?

21  A.  Yes, sir.

22  Q.  Okay.  Now, didn't she tell you at that time, and

23  acknowledge to you that she had gotten the Whizzinator that she

24  had used to help her pass the urine screens from May to August,

25  that she had gotten it from David Price?

46

1  A.  She did.

2  Q.  Okay.  Now, as far as that letter she wrote telling David

3  Price just be warned, if you ever made any kind of deal with the

4  government don't fail a urine screen and don't do anything wrong

5  because they will take it away from you, that was good advice,

6  wasn't it?

7  A.  That's very good advice.

8  Q.  Okay.  I believe that's all I have.

9  A.  Yes, sir.

10       THE COURT:  Redirect, Mr. Moorer?

11       MR. MOORER:  Yes, Your Honor.

12              REDIRECT EXAMINATION

13  BY MR. MOORER:

14  Q.  In follow-up to a question that Mr. Teague asked you, he was

15  asking about different quantities of methamphetamine that

16  different people that she told you about had been moving.  Did

17  she tell you about her own activities as well?

18  A.  She did.

19  Q.  And how much methamphetamine did Ms. Pitts represent to you

20  that she was moving -- that she herself had moved?

21       MR. TEAGUE:  Excuse me, Your Honor, I would like for it

22  to be made clear, what time frame are we talking about here?

23       THE COURT:  If you would just limit the time frame.

24  Q.  What times did you ask her about having distributed

25  methamphetamine?

47

1  A.  We initiated the proffer by talking about her history and

2  how she was introduced to drugs and how she came to be in a

3  position where she was and she talked about being introduced to

4  drugs back in 2000 and subsequent to that she started acquiring

5  amounts of methamphetamine from sources in Atlanta, and by her

6  own proffer, by looking at it, somewhere between 18 and 20

7  pounds.

8  Q.  Of ice methamphetamine?

9  A.  Yes, sir.  And that was over the course of 17 -- 17 months.

10       MR. MOORER:  No further questions, Your Honor.

11       THE COURT:  Any recross?

12       MR. TEAGUE:  No further questions, Your Honor.  I would

13  like to be allowed to recall him if it's necessary, I don't

14  perceive that it will be.

15       THE COURT:  You may step down.

16       THE WITNESS:  Yes, sir.

17       MR. MOORER:  Your Honor, on the issue of the 5K1.1 I

18  don't have any other evidence that I intend to present.

19       THE COURT:  Any additional evidence that you wish to

20  present on behalf of Ms. Pitts on the 5K motion itself before I

21  make a determination of how far or how much of a reduction in

22  her sentence she should be allocated because her substantial

23  assistance?

24       MR. TEAGUE:  Your Honor, again, may I inquire, would

25  this be the appropriate point for me to put Reverend Ed Bush on

48

1  the stand?

2       THE COURT:  You will have an opportunity to put on

3  testimony about mitigation or evidence supporting what you would

4  consider to be a reasonable sentence, but I need to make a

5  ruling on the 5K motion, and unless his testimony would be

6  relevant to that issue, you can reserve him until a later time.

7       MR. TEAGUE:  Your Honor, if it please the Court, I

8  think it would be helpful to hear from the Defendant herself,

9  Amy Pitts.

10       THE COURT:  Okay.

11       THE CLERK:  You do solemnly swear or affirm that the

12  testimony you give in this cause to be the truth, the whole

13  truth, and nothing but the truth, so help you God.

14       THE WITNESS:  I do.

15       **AMY PITTS**, the Defendant, having been duly sworn

16  or affirmed, testified as follows:

17              DIRECT EXAMINATION

18  BY MR. TEAGUE:

19  Q.  You are Amy Pitts?

20  A.  I am.

21  Q.  You are the Defendant in this case, are you not?

22  A.  Yes, sir.

23  Q.  Okay.  Did you have any prior criminal record, Ms. Pitts,

24  before you were arrested by Agent Herman in 2004?

25  A.  No, sir.

49

1  Q. Okay. You have heard much of the testimony here today, you
2  were a methamphetamine distributor, were you not?
3  A. Yes, sir.
4  Q. Okay. And in your proffer sessions you told Agent Herman
5  about much of that, did you not?
6  A. Yes, sir, I did.
7  Q. Is there any particular individual's dealings that you
8  withheld discussing with Agent Herman?
9  A. Yes, Yes, David Price being that he was --
10  Q. All right. Now, you have called David Price by his
11  nickname, Putt-Putt?
12  A. Yes, sir.
13  Q. So if you refer to him as Putt-Putt from time to time, Judge
14  Fuller will know that it's David Price that you are talking
15  about.
16  A. Yes, sir.
17  Q. Okay. Explain to the Court why you did -- did you
18  withhold -- you said you withheld information, why did you do
19  that?
20  A. Well, I never -- I didn't lie, I just chose because he is my
21  husband's first cousin and that he grew up very closely with and
22  such a close family member I just chose to not involve myself
23  with his because I knew he already had state charges and was
24  going to go to prison anyway and really because he was a family
25  member and I just chose not to --

50

1  Q. You saw --
2  A. -- get involved.
3  Q. You saw Defense Exhibit 1 today, the letter that purports to
4  be written by you.
5  A. Yes, I did.
6  Q. You did write it, didn't you?
7  A. I did.
8  Q. And in there you told him that you had not mentioned
9  anything about the Whizzinator and so forth.
10  A. I did. After I -- you know, I knew he had gotten arrested,
11  I was concerned because I hadn't told Agent Herman where I had
12  gotten the Whizzinator, and so in order to -- I was concerned
13  about that coming out and that's when I wrote the letter. And I
14  decided that that wasn't a smart move after I wrote the letter
15  and when they came and did the proffer session I decided that I
16  needed to come out with that.
17  Q. That letter does, among other things, does basically two
18  things, tells him look, I haven't told them anything about you.
19  A. Yes, sir.
20  Q. And I haven't talked about the Whizzinator.
21  A. That was the main focus of the letter was that -- you know,
22  was to hide if he gave me -- what he was going to say where he
23  got the Whizzinator because I didn't want to get him into
24  trouble and get caught in the mix but I realized that wouldn't
25  be the best thing, I just needed to come out with the truth.

51

1  Q. And, but with regard to telling -- you did have -- you have
2  seen David Price's interview with Agent Herman; is that correct?
3  A. I have.
4  Q. Now, I would imagine like most things in this world you
5  don't agree with a hundred percent of what he says but he does
6  allege that you and he were together on some acquisition of
7  methamphetamine for distribution.
8  A. Yes, sir.
9  Q. Is he telling the truth about that?
10  A. He is telling the truth about some things, but he is --
11  there's -- if not an equal amount of things that he has
12  elaborated and exaggerated and not told the truth about, in his
13  briefing with Agent Herman.
14  Q. But as far as his allegation that you and he put money
15  together and at times went to Atlanta --
16  A. Yes, sir.
17  Q. -- and got varying amounts --
18  A. Yes, sir.
19  Q. -- for distribution, that is correct?
20  A. Yes, sir, it is.
21  Q. All right. As to how much and when and other little
22  details, there are some details that you either don't agree with
23  or don't recall being quite that accurate?
24  A. Correct. Yes, sir, that's correct.
25  Q. All right. Now, would it be fair to say that you are an

52

1  addict to methamphetamine?
2  A. Yes, sir, it would be very correct.
3  Q. And would it be fair to say that it's made you do some
4  rather stupid things?
5  A. Yes, sir, very much so.
6  Q. You have tried to fool your probation officer who was taking
7  urine screens, have you not?
8  A. Yes, sir, I have.
9  Q. And you have -- what is your feeling, vis-a-vis your
10  addiction to methamphetamine and this behavior, do you have any
11  thoughts that you would like to share with the Court about it?
12  A. That I have made some very bad decisions, but it's because
13  of my addiction to the drug. And that's just the root of it
14  all.
15  Q. Now, were you able -- as I recall you were released by the
16  Court -- to get with Agent Herman and to try to make cases; is
17  that correct?
18  A. Yes, sir, it is.
19  Q. Okay. And then you were required to go work at your daddy's
20  place; is that correct?
21  A. Yes, sir.
22  Q. Okay. Were you ever able in the midst of the things that
23  happened to get any kind of therapy for your drug addiction?
24  A. No, sir.
25  Q. Okay. And that's not particularly anybody's fault, is it?

53

1  A. No, it's not.

2  Q. I mean we are not blaming probation.

3  A. No.

4  Q. I guess if it's anybody's fault it could be Amy's fault.

5  A. Yes, sir, it could be.

6      MR. TEAGUE: I believe those are all the questions, if

7  Mr. Moorer or the Court has questions of Ms. Pitts.

8              CROSS-EXAMINATION

9  BY MR. MOORER:

10  Q. Ms. Pitts, did you ever tell Agent Herman before they

11  discovered the Whizzinator that you were still getting

12  methamphetamine and using it?

13  A. No, sir, I did not.

14  Q. And did you ever tell them prior to your discovery that she

15  was somebody that you could buy from, Nicole Broadfoot?

16  A. Yes, I did. I told them that -- I didn't tell them I had

17  bought from her but I told them that I could.

18  Q. And do you disagree with David Price when he says that while

19  you were on supervised release, on electronic monitoring, do you

20  disagree with him when he says each of you smoked

21  methamphetamine together?

22  A. No, I do not.

23  Q. And do you agree with him when he says there were times

24  where you actually supplied him with quantities of

25  methamphetamine while you were on supervised release and on EM?

54

1  A. Well, when we used together and he had some, wanted some of

2  what I had, you know, I would give him some of what I had but I

3  never had more than, you know, half of an eight-ball or an

4  eight-ball at a time. And I do disagree with the fact that he

5  said I sold him eight-balls, but on a couple of occasions -- on

6  several occasions I gave him a little bit of what I had and he

7  gave me money for that. So -- so from that aspect no, I don't

8  disagree with him, he exaggerated the amounts that he said that

9  he got from me.

10  Q. And did you receive some of your methamphetamine from Erica

11  Stillwell? From Nicole Broadfoot through Erica Stillwell?

12  A. That's correct. Erica wasn't a friend of mine, I didn't

13  know her, it was Nicole's friend. And like you had mentioned

14  earlier, she just delivered, she just would bring it to me.

15  That's correct.

16  Q. And would she sometimes take the money back too that you

17  owed Nicole for the drugs?

18  A. That's correct. Most of the time Nicole -- several -- many

19  times Nicole would just give me some, but Erica Stillwell was

20  right were she said a hundred dollars full, five or ten times,

21  that she would deliver that to me, but yes, that's correct.

22  Q. Now, was she your only source of supply when you were out on

23  electronic monitoring?

24  A. At first she was and then as of July, the beginning of July,

25  I just so happened to run into a girl named Christy Burt, and

55

1  she gave me some a couple of times. And I told Joe that I had

2  ran into her, and no, I didn't tell him that I was using, but

3  yeah -- yes, sir, I got some from Christy Burt also.

4  Q. And what quantities were you getting from Christy Burt?

5  A. First time I got about a half an eight-ball from her. The

6  first time I saw her I didn't get any from her, I used with her,

7  and the first time I actually got some from her was half an

8  eight-ball and I never got more than an eight-ball at a time

9  from her because I couldn't afford it.

10  Q. So you basically had two sources of supply, Nicole Broadfoot

11  and Christy Burt?

12  A. From July, at first it was just Nicole, that was the only

13  person that I had, but then after July I got some from Christy a

14  couple of times, yes, sir.

15  Q. During the same period of time?

16      THE COURT: July of what year?

17      THE WITNESS: 2005.

18      THE COURT: I'm sorry.

19      MR. MOORER: I'm sorry, Your Honor.

20  Q. So you were getting from Christy Burt and Nicole Broadfoot

21  during the same period of time?

22  A. A month before I got -- failed my drug test was the only

23  time that I was around Christy Burt. And the way I know that's

24  the only time I seen her is because I ran into her at a

25  gathering at my house, and it happened to be on my dad's

56

1  birthday, so I was arrested August the 31st, and that was

2  January -- I mean July, like the 3rd or something like that,

3  that weekend.

4  Q. Was Christy Burt supplying you after Nicole Broadfoot?

5  A. Yes.

6      MR. MOORER: No further questions.

7      MR. TEAGUE: Your Honor, unless you have questions of

8  Ms. Pitts.

9      THE COURT: I don't have questions. You may step

10  down. Any other testimony or evidence involving the

11  government's motion for a 5K1.1 departure?

12      MR. MOORER: Your Honor, in light of her testimony, I

13  do intend to call Mr. Price to testify.

14      THE COURT: Call your next witness.

15      THE CLERK: You do solemnly swear or affirm that the

16  testimony you give in this cause to be the truth, the whole

17  truth, and nothing but the truth, so help you God.

18      THE WITNESS: Yes, ma'am.

19      DAVID PRICE, witness for the Government, having

20  been duly sworn or affirmed, testified as follows:

21              DIRECT EXAMINATION

22  BY MR. MOORER:

23  Q. For the record would you state your name, please.

24  A. David Lucas Price.

25  Q. And Mr. Price, are you familiar with Amy Pitts?

**57**

1  A. Yes, I am.

2  Q. Would you tell the Judge how it is that you are familiar

3  with her?

4  A. She is married to my cousin, and me and her is good friends.

5  Q. Now, Mr. Price, during your time that you have gotten to

6  know her as a family member, did you have a relationship with

7  her that went beyond a family relationship?

8  A. No, sir.

9  Q. Well, did you have any relationship that extended to

10 narcotics, is what I am getting at?

11 A. Oh, yes, sir.

12 Q. Would you tell the Judge when that started, roughly?

13 A. Whenever she lived on Baldwin Brook.

14      MR. MOORER:  Now, if I may approach the witness, Your

15 Honor.

16 Q. Was that in 2005?

17 A. I don't know, it could have been 2004.

18 Q. Now, are you familiar with her having been arrested and put

19 on electronic monitoring?

20 A. Yes, sir.

21 Q. During the time that she was on electronic monitoring did

22 you have a relationship with her that was in any way related to

23 narcotics?

24 A. Yes, sir.

25 Q. Would you tell Judge Fuller what that relationship was.

**58**

1      THE COURT:  You need to sit up so that you can speak

2  into the microphone and the court reporter can hear you,

3  Mr. Price.

4  A. Yes, sir.  You asked me what to --

5  Q. Would you tell the Judge what your relationship with her was

6  while she was on electronic monitoring as it relates to

7  narcotics.

8  A. Well, we smoked together, and I bought a couple of balls

9  from her.

10 Q. Now, when you say you bought a couple of balls from her, how

11 much did you pay for them?

12 A. 280.

13 Q. Two hundred and 80 dollars?

14 A. Yes, sir.

15 Q. And we are talking about eight-balls of methamphetamine?

16 A. Yes, sir.

17 Q. Now, did she give you any?

18 A. She smoked with me.

19 Q. Was there times where she gave you some that you didn't have

20 to pay for it?

21 A. Smoked with me, she didn't give me none.

22 Q. I'm sorry, I didn't --

23 A. She smoked with me but she didn't give me any.

24 Q. So the methamphetamine you got from her you had to pay her

25 for it?

**59**

1  A. Yes, sir.

2  Q. Do you know about how many times you might have gotten

3  methamphetamine from her while she was on electronic monitoring?

4  A. Three or four times.

5  Q. And was each time that you got from her an eight-ball?

6  A. Yes, sir.

7  Q. Do you know where -- did she ever tell you where she got her

8  methamphetamine from that she sold to you?

9  A. No, sir, but one time she did, like --

10 Q. Would you tell us about that.

11 A. From Knick-Knack.  From Nicky.

12 Q. Was that Nicole Broadfoot, her nickname?

13 A. Yes, sir.

14 Q. Now, do you know of anybody else that she told you that was

15 supplying her during this time that she was on electronic

16 monitoring?

17 A. Yes, sir.

18 Q. Would you tell us about that?

19 A. Christy, some girl named Christy.

20 Q. Do you know Christy?

21 A. I know of her.

22 Q. Have you ever met her before?

23 A. Yes, sir.  I have seen her before, but I didn't know her

24 personally.

25 Q. And did you meet her through the Defendant or somebody else?

**60**

1  A. Through the Defendant.  Not during this time, but at a

2  different time, like previously.

3  Q. Now, during the time that she was on electronic monitoring

4  and you were using methamphetamine together, where did y'all use

5  the methamphetamine?

6  A. At my house.

7  Q. Where was your house at that time?

8  A. Sunset Drive.

9  Q. And where is that?

10 A. Off of Perry Hill Road.

11 Q. Is that here in Montgomery?

12 A. Yes, sir.

13 Q. Did you ever use methamphetamine with her at other places?

14 A. At Lenox Court.

15 Q. Now, is there anything distinctive about the place on Lenox

16 Court?

17 A. Like in --

18 Q. Any of the doors there on Lenox Court.  I'm sorry, let me

19 withdraw that.  You used it at Lenox Court, whose house is that

20 or was that at the time?

21 A. Amy's house.

22 Q. Were you living there or just using there?

23 A. I was living there.

24 Q. And did you ever have any contact with her at another place,

25 Sunset?

61

1  A. Yes, sir.
2  Q. And where is that?
3  A. Sunset?
4  Q. Yes, sir.
5  A. Off of Perry Hill Road.
6  Q. Here in Montgomery?
7  A. Yes, sir.
8  Q. And the Lenox Drive location you just talked about, is that
9  in Montgomery as well?
10 A. Yes, sir.
11 Q. Is there anything unusual about the Sunset Drive location as
12 far as any of the doors?
13 A. As any of the doors?
14 Q. Yes.
15 A. Any of the doors?
16 Q. Yes. Are there any paintings on any of the doors there?
17 A. Yes, sir, there is.
18 Q. Would you tell us what it is.
19 A. I painted a girl on a door in my bedroom.
20 Q. And did you and she have any of your narcotics transactions
21 there where either she provided you with the drugs or you smoked
22 drugs?
23 A. Yes, sir. Yes, sir.
24 Q. Now, what time of the day or night would these encounters
25 occur where you would smoke methamphetamine that you got from

62

1  her?
2  A. During the day.
3  Q. And were there any times that were in the evening?
4  A. Yes, sir.
5  Q. And would you go to where she was to do these transactions
6  or would she come to where you were?
7  A. Come to where I am.
8  Q. Now, you say that some of these times took place at Lenox
9  Court, was she supposed to -- why was she able to be there at
10 Lenox Court as opposed to being at her father's house where she
11 was supposed to be?
12 A. Because she was fixing the house up to sell.
13 Q. And so at the same time that she was supposed to be there
14 fixing it up to sell -- let me ask you, did she do anything to
15 try to fix it up to sell?
16 A. Yes, sir.
17 Q. And at the same time she would be doing that would that be
18 when some of these encounters took place?
19 A. Yes, sir.
20 Q. Did you have conversations with her after she got caught
21 with the Whizzinator?
22 A. Yes, sir.
23 Q. And were these telephone conversations?
24 A. Yes, sir.
25 Q. And the letter that has been introduced here, was that a

63

1  letter that was sent to you by her?
2  A. Yes, sir.
3      MR. MOORER: One moment, Your Honor.
4  Q. Mr. Price, you were on supervised release at one point or on
5  bond at one point too after your arrest, were you not?
6  A. Yes, sir.
7  Q. And were you on bond at the time that some of these
8  encounters took place with her that you just testified about?
9  A. No, sir, it was before I was on bond.
10 Q. Did there come a time though where you were arrested and put
11 on bond?
12 A. Yes, sir.
13 Q. Which was during -- and was she also released at that same
14 time? Was Amy Pitts out on bond at that same time?
15 A. Yes, sir.
16 Q. And did there come a time when your bond was called into
17 question?
18 A. By me failing the test, yes, sir.
19 Q. And how did you attempt to -- how did you end up failing
20 the test?
21 A. Taking methamphetamine.
22 Q. And did you do anything to try to avoid it being caught
23 having used methamphetamine?
24 A. I did. I used a Whizzinator.
25 Q. And where did you get it from?

64

1  A. From Amy.
2  Q. And was she caught at the same time?
3  A. Yes, sir.
4  Q. So y'all were both taking the test on the same day?
5  A. Yes, sir.
6      MR. MOORER: No further --
7  Q. Now, the day that you were caught with the Whizzinator and
8  she -- did she have a Whizzinator as well?
9  A. Yes, sir.
10     MR. MOORER: No further questions.
11              CROSS-EXAMINATION
12 BY MR. TEAGUE:
13 Q. Mr. Price?
14 A. Yes, sir.
15 Q. I am Barry Teague. You are hiding behind the screen, could
16 you come out from behind the screen so I can ask you some
17 questions?
18 A. Yes, I will.
19 Q. Mr. Price, there are two Whizzinators in this thing between
20 you and Amy; correct?
21 A. Yes, sir.
22 Q. Who gave who a Whizzinator first? Isn't it true that you
23 gave her a Whizzinator first --
24 A. Yes, sir.
25 Q. And she is an addict, right?

65

1  A. No doubt.
2  Q. And you are an addict, right?
3  A. Yes, sir.
4  Q. Okay. And you assisted her knowing that that was assisting
5  her in so-to-speak hoodwinking her probation officer, right?
6  A. Yes, sir.
7  Q. And you were interested in doing the very same thing to your
8  probation officer, right?
9  A. Yes, sir.
10  Q. Was it because you are a mean person or just because you are
11  an addict?
12  A. I am an addict.
13  Q. That would be fair to say about Amy, wouldn't it?
14  A. For sure.
15  Q. Now, the -- so at some point you had furnished her first a
16  Whizzinator, later on she came into possession of a Whizzinator,
17  do you know how she got it?
18  A. Yes, I made her one.
19  Q. Excuse me?
20  A. I made it for her.
21  Q. No, that's the first one. She gave you one to help you,
22  right?
23  A. Right.
24  Q. And that was -- where did she get that one from?
25  A. I have no clue.

66

1  Q. All right. Have you entered into an agreement with the
2  government in your case?
3  A. Yes, sir.
4  Q. And according to your agreement what is the amount of time
5  the government is going to recommend to the Court that you
6  serve?
7  A. I don't know that yet.
8  Q. There's not a time that's been specified?
9  A. It has, but --
10  Q. Well, tell us what it is.
11  A. Five years.
12  Q. That would be 60 months.
13  A. Uh-huh. (positive response)
14  Q. With some possibility of further downward departure based on
15  your testimony here today?
16  A. Possibly. That's with my cooperation.
17  Q. Correct. And is the term of 41 months floating around out
18  there under some circumstances?
19  A. Not that I know of.
20  Q. Not that you know of?
21  A. Not that I know of.
22  Q. Has that been discussed with you at all?
23  A. 41 months?
24  Q. Yes, sir.
25  A. No, sir.

67

1  Q. Now, the -- you have looked at the guidelines with regards
2  to your case, have you not?
3  A. Yes, sir.
4  Q. Now, if you have got what -- according to your own
5  statements and what the government has against you, tell Judge
6  Fuller what you would be getting without this deal. What would
7  be the guideline range?
8  A. For what crime?
9  Q. For dealing methamphetamine.
10  A. Okay. But what -- I am getting charged with something
11  totally different than what you are saying. I don't have no
12  amount.
13  Q. Well, since we are here in court, tell Judge Fuller then
14  what are you getting charged with?
15  A. With firearms, having firearms.
16  Q. So the government is not even going to charge you with
17  having distributed --
18  A. I have point two.
19  Q. Excuse me?
20  A. Point two.
21  Q. Point two what?
22  A. Grams, that's what I had.
23  Q. Well, in your interview with Agent Herman you talked about a
24  lot more in the way of weight of methamphetamine.
25  A. That was after the plea agreement, and the plea agreement

68

1  covered me to tell it all.
2  Q. Right. But except for the plea agreement --
3  A. Except for the plea agreement.
4  Q. -- if you were charged for the methamphetamine that you in
5  truth and in fact have dealt, what kind of sentence would you be
6  looking at?
7  A. I have no clue. It wouldn't be pretty.
8  Q. It would be well above ten years and perhaps 20, wouldn't
9  it?
10  A. No doubt, yes, sir.
11  Q. And with firearms they stick you way on up there, don't
12  they?
13  A. Yes, sir.
14  Q. Okay. What date were you first arrested?
15  A. January 28th.
16  Q. In your Federal Court case?
17  A. January 28th.
18  Q. What about your statement, now, you were charged with
19  trafficking methamphetamine in Autauga County, weren't you?
20  A. No, sir. I was --
21  Q. Did you have some state court charges?
22  A. No, sir. I got arrested -- I got picked up on -- for having
23  a firearm six feet from dope, and that's what I got -- so
24  then --
25  Q. So if I go over and look in the clerk's office there's no

69

1  case against you either in District Court or Circuit Court for
2  either methamphetamine or any other controlled substance?
3  A. No, sir. There may have been one flying my way if I didn't
4  do what I needed to do.
5  Q. In other words they had one hanging over your head, you have
6  been arrested, it's just that they haven't pursued it yet?
7  A. No, I have been arrested for what I am getting charged with.
8       MR. TEAGUE: I believe that's all I have, Your Honor.
9       MR. MOORER: I have no further questions, Your Honor,
10  and I don't have anything further to present at this point.
11      THE COURT: You may step down, Mr. Price. Mr. Teague,
12  do you have anything further?
13      MR. TEAGUE: Your Honor, I feel like I should put --
14  well, I would like to call Agent Herman back to the stand just
15  to be really sure about one thing.
16      **JOE HERMAN**, witness recalled by the Defendant,
17  having been previously duly sworn or affirmed, testified as
18  follows:
19                    DIRECT EXAMINATION
20  BY MR. TEAGUE:
21      MR. TEAGUE: Your Honor, if it's okay, just to save
22  time.
23      THE COURT: Is the testimony going to be brief?
24  Q. Yeah. On December 7th Amy told you about the trading of the
25  Whizzinators and told you about where she got the Whizzinator

70

1  that she had given David Price and David Price had given her the
2  one she was using.
3  A. I believe that's right. I believe she said she got it from
4  Nicole Broadfoot.
5  Q. Yeah.
6       MR. TEAGUE: And Ms. Pitts for about two questions,
7  Your Honor?
8       THE COURT: Excuse me? Any questions as a follow-up to
9  this witness?
10      MR. MOORER: No, sir.
11      THE COURT: Ms. Pitts, I remind you you are still under
12  oath.
13      THE DEFENDANT: Yes, Your Honor.
14      **AMY PITTS**, the Defendant, having been previously
15  duly sworn or affirmed, testified as follows:
16                    DIRECT EXAMINATION
17  BY MR. TEAGUE:
18  Q. Ms. Pitts, with regard to the testimony you just heard of
19  David Price, I am not sure if it became clear so let me ask you
20  a few questions about that. There was a period of time where
21  you would go to lunch during the day?
22  A. That's correct.
23  Q. And you have gone over the DEA-6 interview form that Agent
24  Herman has provided us as discovery for this hearing, right?
25  A. Yes, sir.

71

1  Q. And David Price indicated in there that you and he would
2  during that lunch hour and use together; is that correct?
3  A. Yes, sir.
4  Q. Okay. It appears to me the only -- and at your daddy's
5  business they take a lunch hour, don't they?
6  A. Yes, sir, they do.
7  Q. And that house -- well, without getting into the house, let
8  me ask you this, it appears that one thing he said that you
9  seemed to disagree with is he claims you sold him entire
10  eight-balls. Address that and tell the Judge what the situation
11  was, did you ever sell him an entire eight-ball?
12  A. No, I didn't.
13  Q. And why would you not?
14  A. Because I didn't have enough. I mean I never had enough.
15  And the time whenever I had two sources was the last month and
16  it just -- I had only seen that girl Christy, the second source
17  for that month, and it just wasn't that rapid. I just didn't
18  have enough. David got up with Nicole himself on several
19  occasions, but what he got from me was not -- wasn't
20  eight-balls. That's the only thing I disagree with, but I still
21  --
22  Q. Would you take money from him under any circumstances in
23  these times?
24  A. Yes, I would.
25  Q. Well, explain that to Judge Fuller then.

72

1  A. I would get money from him on -- you know, if he wanted some
2  of what I had, depending on how much I had, I am not saying that
3  if I had an eight-ball that I wouldn't give him half of it and
4  take money for it, because, you know, that would be a fair
5  statement.
6  Q. You did that.
7  A. Yes, I did, but not a whole eight-ball.
8  Q. And he's claiming I think he said maybe on two or three
9  occasions or four occasions you sold him a whole eight-ball.
10  Did you ever do that?
11  A. No, I didn't.
12      MR. TEAGUE: That's all.
13      MR. MOORER: I don't have any further questions of her,
14  Your Honor.
15      THE COURT: Ms. Pitts, let me ask you a question.
16      THE DEFENDANT: Okay.
17      THE COURT: You did sell David Price some amount of
18  methamphetamine while you were on electronic monitoring after
19  you were arrested in January of 2004?
20      THE DEFENDANT: Yes, Your Honor.
21      THE COURT: How many times did you do that?
22      THE DEFENDANT: I am not sure. We used several
23  occasions, and I didn't -- I didn't go to sell it to him, I went
24  for us to use together and it just so happened he would ask me
25  for some of it and I would give it to him, but I am not sure on

73

1   how many times.  I am not sure, several occasions.
2       THE COURT:  Several, would that be more than ten or
3   less than ten?
4       THE DEFENDANT:  That would be less than ten, most
5   definitely.
6       THE COURT:  That's all I have.  Anything else from the
7   government?
8       MR. MOORER:  Just one thing.
9              CROSS-EXAMINATION
10  BY MR. MOORER:
11  Q.  You said 2004, but you meant 2005?
12  A.  Did I say that?
13      MR. MOORER:  The Judge said 2004.
14      THE COURT:  I just said after she was arrested in
15  January of 2004, isn't that when she was arrested?
16  A.  Yes, sir.
17  Q.  But you were on EM in 2005.
18  A.  That's correct.
19  Q.  And these events that Mr. Price just talked about and you
20  just talked about occurred in 2005.
21  A.  That's correct.  They happened between the end of 2005 --
22      MR. MOORER:  No further questions.
23      THE COURT:  Anything else, Mr. Teague?
24      MR. TEAGUE:  No, Your Honor.
25      THE COURT:  You may step down.

74

1       MR. TEAGUE:  Your Honor, we rest with regards to the
2   downward departure motion.
3       THE COURT:  Anything further from the government on the
4   issue of the 5K motion?
5       MR. MOORER:  Nothing further on the 5K motion.
6       THE COURT:  Ms. Caple, can I ask you to step up here
7   just for the sake of time.
8       PROBATION OFFICER:  Yes, sir.
9       (At which time an off-the-record discussion was had
10  between the Court and the probation officer.)
11      THE COURT:  Ms. Pitts, if you would stand.  After
12  inquiry from the Court and based upon the request of the United
13  States, the Court finds that the government's motion for a
14  downward departure for your substantial assistance should be and
15  is granted.  This finding results in a reduction in the
16  criminal -- let me restate.  This finding results in a reduction
17  in the guideline level to an offense level of 32, which, when
18  combined with the criminal history category, creates a guideline
19  range of one hundred 21 months to one hundred 51 months, and a
20  fine range from 17 thousand five hundred dollars to two million
21  dollars.
22      Mr. Teague, do either you or your client have anything
23  to say in mitigation or otherwise before the Court pronounces
24  sentence in this case?  This is the time that you can call
25  witnesses for your argument as to reasonableness under 18 United

75

1   States Code Section 3553(a).
2       MR. TEAGUE:  Your Honor, I would like to address
3   what -- I would like for the Court to consider what the
4   government had asked for in the downward departure motion, and
5   instead add elements to it based upon the weighted factors that
6   are set forth in the probation report.  The presentence report,
7   Your Honor, for instance, it would appear to me that based upon
8   what the government said as of July 28th of 2005 she deserved,
9   and they have not backed off of how vital that information was
10  and how it has helped in yet other investigations beyond
11  Investigation Avalage or Project Avalage.  She was at level 19
12  because the government was recommending 36 months.
13      Now, it's my feeling that it would be equitable and
14  fair and permissible for this Court to proceed under the
15  provisions of Title 18 Section 3553 to add points for various
16  things that are involved.  Now, also, there are supposed to be
17  two points coming out of this for acceptance of responsibility.
18  What I feel would be appropriate would be leaving the acceptance
19  of responsibility for a moment, the allegation was that there
20  was a firearm found.
21      Now, Judge, the firearm was found a great distance from
22  the methamphetamine that caused Amy's arrest that was found.
23  But even if you go -- add two points for that as the guidelines
24  call for you get up to a level 21.  Since she obstructed justice
25  you add two more levels, that would take you up to a level 23.

76

1   There's another aspect in the presentence report, it's escaping
2   me now, that you add I think another two points.
3       And then if the Court were to say well, she fell off
4   the wagon and she -- saying something akin to a supervisory
5   release kind of thing, you would add somewhere, if it's
6   considered a level one Class B violation, you would only add
7   like four to ten months.  At worst, if it's a Class A violation,
8   you would only add 36 months at most.  And Judge, I don't see
9   that getting any higher than a level 28.
10      So I would encourage the Court to work from what she
11  once had and punish her for obstruction of justice, as the
12  guidelines call for it, and work up.  And I submit that you
13  shouldn't get beyond the level 28 which would be 87 to -- 78 to
14  97 months.  That would be my argument, Your Honor.  And I think
15  that would be fair and equitable based upon Agent Herman's
16  telling the Court that she was very helpful in some very
17  important cases.
18      THE COURT:  Any response from the government?
19      MR. MOORER:  Your Honor, I believe the Court has heard
20  this argument, and I think that even though she was helpful, the
21  starting point of 36 months is unreasonable the other way, Your
22  Honor.  And beyond that I can't say further.
23      MR. TEAGUE:  Your Honor, I would remind the Court that
24  she had no prior record.  I know Mr. Moorer has said that he
25  didn't agree with what Mr. Brown determined would be a fair

77

1  thing, but I think if you look at Section 3553 of Title 18 you
2  will see there's a safety valve provision in there. And the
3  only thing that I have seen that they have come up with that Amy
4  did that was not forthright with the government was -- well, two
5  things, she suffered from an addiction, and number two, she felt
6  a loyalty to a Defendant that she would otherwise have told the
7  information on that is David Price. Your Honor, I don't feel
8  like -- while those kinds of loyalties may be questionable in
9  this context I think they are at least understandable,
10 particularly thrown in with the addiction on top of that. So
11 Judge, I would encourage the Court to remember that you could
12 have possibly applied the safety valve provision which is
13 provided for under the Code, as well as the guidelines.
14     MR. MOORER: Your Honor, in response, if I may. She
15 could not have qualified for the safety valve because of the
16 firearm. So that wouldn't have been possible. But even if it
17 had been possible, Your Honor, I submit that under the totality
18 of the circumstances the guideline range that you have
19 calculated is a reasonable sentence within that range.
20     MR. TEAGUE: Your Honor, I submit if the Court looks at
21 the indictment, the United States chose to put the matter before
22 the grand jury. They did not charge her with firearm in
23 furtherance of a drug crime. It's just not there. And if all
24 the cases that led up to the Booker/Fan-Fan case mean anything,
25 we are not supposed to go out and try to try cases that aren't

78

1  there. And Your Honor, I submit that the United States took a
2  fair look at it and said hey, the methamphetamine that Amy Pitts
3  had was in an outbuilding, out back. This gun was in the house,
4  and arguably there for somebody's personal protection, not
5  necessarily related to the other. It was there, it was in Agent
6  Herman's report, and we are adding two points for the guideline
7  here, because it was present. I haven't even chosen to make a
8  big argument about that. But Judge, he says Mr. Brown made this
9  decision, I think it's a fair decision. So, there again, I
10 would hope the Court would settle more in the neighborhood of
11 the guideline level 26 to 28 based upon the things that are in
12 the presentence report that should be added to what she had.
13     THE COURT: Anything further?
14     MR. TEAGUE: No, Your Honor.
15     THE COURT: Ms. Pitts, you negotiated your plea
16 agreement with the United States. After you were arrested in
17 January of 2004, you made bond the day after you were arrested.
18 You were again picked up because of your continued use of
19 methamphetamine while on bond on April the 12th, 2004. You
20 again persuaded the Court to allow you to be released on
21 electronic monitoring in May of 2004. Based on the testimony I
22 have heard here today not only did you continue to use
23 methamphetamine, you continued to sell methamphetamine and then
24 you attempted to deceive probation while on electronic
25 monitoring and while under the requirements of supervised

79

1  release. If there's anyone to blame in this entire set of
2  circumstances it is Amy Pitts. That is my ruling on the 5K
3  motion.
4      Is there anything, Mr. Teague, that either you or your
5  client have to say in mitigation or any evidence that you wish
6  to present or otherwise before the Court pronounces its sentence
7  in this case?
8      MR. TEAGUE: Your Honor, you are finding that the
9  appropriate level under the guidelines is level 32?
10     THE COURT: My finding is that the appropriate
11 guideline recommended range for the offense level and criminal
12 history category that Ms. Pitts is subject to is an offense
13 level 32, criminal history category I. And for a recommended
14 sentence between one hundred 21 and one hundred 51 months.
15     MR. TEAGUE: Okay. Your Honor, we would like to
16 present the testimony of the Reverend Edward Bush who runs
17 Wellspring for Women.
18     THE COURT: You may call any witness you wish, and you
19 may be seated, Ms. Pitts.
20     THE CLERK: You do solemnly swear or affirm that the
21 testimony you give in this cause to be the truth, the whole
22 truth, and nothing but the truth, so help you God.
23     THE WITNESS: Yes, ma'am.
24     **EDWARD BUSH**, witness for the Defendant, having
25 been duly sworn or affirmed, testified as follows:

80

1                    DIRECT EXAMINATION
2  BY MR. TEAGUE:
3  Q. You are Reverend Edward Bush?
4  A. Yes, sir.
5  Q. And tell the Judge what you do for a living, sir.
6  A. Judge Fuller, we have a ministry, 12-18 months for crack
7  cocaine, heroin, the very worst that the Devil has to put out or
8  the world has to put out.
9  Q. Reverend, we are talking about methamphetamine, do you also
10 address that?
11 A. As a matter of fact, my secretary was arrested in Lee County
12 three years ago for doing methamphetamine. The bottom line is,
13 Judge, Jesus sets people free and now this woman is my
14 secretary. Under the system they wanted to lock her up, but
15 thank God there's a Judge in Lee County that said there's hope
16 for Misty and they adjudicated her to our ministry and now three
17 years later she is totally free from methamphetamine and she is
18 not on the street selling and she is my secretary in the
19 ministry. And that's what we do in ministry. God does it
20 because God can do that. It sets the captives free and that's
21 what our ministry is is taking the worst that the world has,
22 have no hope, have no answers and we have the answers and his
23 name is Jesus.
24 Q. Reverend Bush, would you tell us what you do, and
25 specifically if the Court were to release Amy for 12 to 18

81

1  months to your custody, tell the Judge what you do. I
2  understand the theory underlying it, but explain to him what you
3  do.
4        THE COURT: I think his question is what is Wellspring
5  Ministries?
6  A. It is a ministry, a God-called, God-anointed ministry.
7  Biblically, Isaiah 61, Luke 4, Jesus came to set the captives
8  free. I understand that's hard for the world to understand, but
9  the truth, if any man be in Christ he is a new creature. Old
10  things have passed away, behold old things become new. Bottom
11  line, the word of God sets them free.
12  Q. Reverend Bush, if you would, maybe I should ask it this
13  way. We realize that you use the Scripture, that's good.
14  A. Yes, sir.
15  Q. We applaud you and encourage you in that, but my question is
16  I think what the Judge needs to know, what typically does one
17  who is in your custody, what happens from the time they wake up
18  in the morning until they go to bed at night, what kind of
19  activities, what kind of things do you do?
20  A. They are feet on the floor at 5:30. They clean their room,
21  makeup immaculately neat. They are in prayer by 7:00. They eat
22  breakfast. We have our own Bible school, we write our own
23  curriculum, we teach the Bible, the Word of God, which is the
24  truth, the only truth I know of. We teach the truth to them for
25  four hours. In the afternoons they are busy with jobs and

82

1  duties there in the ministries. Or if they need Christian
2  counseling, the Word of God, we spend more time with them in
3  whatever bondage, whatever strong hold they may be dealing with,
4  we are a highly structured, highly disciplined ministry.
5  Q. That's the kind of thing I want you to tell the Judge more
6  about, how structured and how -- elaborate more on that so the
7  Judge can appreciate what you do.
8  A. I understand. Well, the structure is these ladies that we
9  have there, they come of their own volition or they are
10  adjudicated through the courts. Judge Lynn Bright, Randy
11  Thomas, Tracy McCooey have adjudicated women to us. And they
12  understand that if they are adjudicated if they leave they will
13  be arrested, so that gives us a little leverage there, but if
14  they come voluntarily, if they leave, they leave. We are a
15  faith-based Christian ministry, they don't pay anything. We
16  trust God for our finances. But they are there, they don't
17  leave the property, they are under 24 hour supervision and
18  surveillance. They can't even have visitors until they have
19  been there three months to show that they are really sincere
20  about what we are going to administer to them. Again, we are
21  not a jail, we are a ministry. But if they choose to leave, in
22  Amy's case, I would hope if God grants her to us, if she is
23  adjudicated there, she would go straight to jail for the full
24  sentence.
25  Q. Now, this ministry grew out of a previous ministry that the

83

1  Court may be familiar with, what ministry was that?
2  A. Brother Mack Canaan Land for Men. I worked with Brother
3  Mack and Mack's associate, and after so many years with such a
4  dire need for a Christian place for women, I separated from
5  Brother Mack in a friendly situation and I started the women's
6  ministry, started a home for women like Amy who have hit the
7  bottom and simply have no hope.
8  Q. How many people do you have in Wellspring for Women now?
9  A. Ten. We have ten students.
10  Q. And it's located in Marbury, Alabama?
11  A. In Autauga County, eastern Autauga County.
12  Q. That's in Autauga County?
13  A. Yes, sir.
14  Q. Now, tell Judge Fuller what kind of a facility you had. In
15  other words, Reverend, if the Judge and I were to get in an
16  automobile and drive up there right now, when we got there do we
17  see a white frame house? Do we see a brick building? Do we see
18  a big dorm? Give him some kind of idea what we are talking
19  about.
20  A. Residential, we have independent homes staffed by
21  counselors. We are building a brand new facility now for women
22  who have children. There's women -- most of the time they are
23  welfare children and now we are building a new facility, 64
24  hundred square feet to reunite these women and their children
25  when they get their life straightened out in the Lord. Most of

84

1  them are -- I have an outreach for children, so we have
2  instituted a new part of the ministry to help women and children
3  get back and be acclimated and trained to be mothers and
4  establish that family on the right foundation to be successful
5  in society.
6  Q. Can you tell the Judge what -- how long have you been in
7  operation, Reverend Bush?
8  A. We started in 1984, Your Honor. 1984.
9  Q. Be candid with the Court and tell us what your success/
10  failure rate is, so-to-speak.
11  A. Overall a lot of the ladies don't stay, because we are a
12  highly structured -- I have had many of them tell me to my face
13  I would rather be in jail than what we are here.
14  Q. Give the Judge a feeling for how many stay and leave.
15  A. 86 percent of ours elect to stay. I would say take a figure
16  of ten, seven out of ten will stay with us. We have an 86
17  percent cure rate to those that go through and stay in our
18  ministries 12 to 18, 86 percent of them continue on because they
19  are simply set free, they are delivered from their addiction,
20  delivered from the addiction, period.
21  Q. And I believe you sent one of your counselors to the jail to
22  meet with Ms. Pitts and have y'all determined that she would be
23  suitable for your place?
24  A. This is true.
25        MR. TEAGUE: Your Honor, unless you have questions,

85

1   that's all I have.
2          THE COURT:  Any cross from the United States?
3          MR. MOORER:  I don't have any questions, Your Honor.
4          THE COURT:  Thank you, Reverend Bush.  Thank you for
5   coming.  Do you have any other witnesses?
6          MR. TEAGUE:  No, Your Honor.
7          THE COURT:  You do not?  Would you like a moment with
8   your client?  Would you like a moment with your client?
9          MR. TEAGUE:  Could I have a second, Your Honor?
10         THE COURT:  Sure.
11         MR. TEAGUE:  That's all, Your Honor.
12         THE COURT:  If you and your client would approach the
13  podium.  Ms. Pitts, the sentence will now be stated but you will
14  have a final chance to make legal objections before the sentence
15  is imposed.  Based upon the advisory guideline range and the
16  applicable statutory factors, it is the judgment of this Court
17  that you, Amy Pitts, be committed to the custody of the Federal
18  Bureau of Prisons to be imprisoned for a total term of one
19  hundred 21 months.  Based upon your inability to pay the Court
20  waives the imposition of a fine.  However, you shall pay to the
21  United States District Court Clerk a special assessment fee of
22  one hundred dollars, which is due immediately.  The Court finds
23  that there is no identifiable victim who incurred a financial
24  loss as a result of this offense.
25         Upon release from imprisonment you shall be placed on

86

1   supervised release for a term of four years.  Within 72 hours of
2   release from custody you shall report to the probation office in
3   the District to which you are released.  While on supervised
4   release you shall comply with the mandatory and standard
5   conditions of supervised release on file with this Court.  The
6   Court also orders the following special conditions:  You shall
7   participate in drug testing and/or treatment and contribute to
8   the cost of any treatment based upon your ability to pay and the
9   availability of third-party payments.  You shall submit to a
10  search of your person, residence, office or vehicle pursuant to
11  the search policy of this Court.  You shall cooperate with the
12  probation officer in the collection of DNA.  The Court
13  recommends that you be designated to a facility where intensive
14  residential substance abuse treatment is available.
15         The Court finds that the sentence that has been stated
16  in this case is a reasonable sentence based upon the information
17  that has been testified to here in court today, and for the need
18  to reflect the seriousness of the offense, to promote respect
19  for the law and to provide just punishment for the offense, to
20  afford an adequate deterrence to criminal conduct, to protect
21  the public from any further crimes of you, Ms. Pitts, and to
22  provide you with the needed educational or vocational training,
23  medical care or other correctional treatment in the most
24  effective and efficient manner available to this Court.  The
25  Court further finds that any lesser sentence would be

87

1   insufficient to accomplish the purposes set forth in 18 United
2   States Code Section 3553(a)(2).  Are there any objections to the
3   sentence or to the manner in which the Court pronounced it?  For
4   example, do you have any objections to the Court's ultimate
5   findings of fact or conclusions of law?
6          MR. TEAGUE:  Your Honor, our objections are those that
7   would have been previously stated on the record.
8          THE COURT:  Any objections from the United States?
9          MR. MOORER:  No, Your Honor.
10         THE COURT:  Ms. Pitts, the sentence is ordered imposed
11  as stated.  The Court will now address your right of appeal.
12  Consistent with this Court's ruling, the Court determined that
13  you entered into a binding plea agreement, which by the very
14  terms of the plea agreement with the United States it is
15  undisputed that you violated.  As part of that binding plea
16  agreement you waived your right of appeal or collateral attack.
17  But to the extent that you have rights of appeal which remain, I
18  want to advise you of those rights.  To the extent that you have
19  rights available to you for appeal, for your appeal to be timely
20  you may need to file your appeal as soon as ten days after the
21  Court enters its written judgement in this case.  If you can not
22  afford the cost of an appeal you may petition the Court for
23  leave to appeal in forma pauperis.  As stated, pursuant to the
24  plea agreement you have waived some or all of your rights to
25  appeal your sentence.  Such waivers are generally enforceable,

88

1   but if you believe your waiver is not enforcible you may present
2   that theory to the appropriate appellate court.  I am not
3   encouraging you to appeal or not to appeal, Ms. Pitts, I am
4   merely informing you of your rights regarding appeal.  Do you
5   understand those rights?
6          THE DEFENDANT:  Yes, sir.
7          THE COURT:  Do you have any questions about your appeal
8   rights?
9          THE DEFENDANT:  No, sir.
10         THE COURT:  Ms. Pitts, I don't intend on trying to
11  lecture you, I think that hopefully by the circumstances that
12  you find yourself in today, words can not adequately describe
13  what must be going through your mind right now.  You are a young
14  woman, and there's a lot of life ahead of you.  I take no
15  personal pride or comfort in sentencing a person with the
16  opportunities that you have in life to prison.  But I hope that
17  you can take this opportunity and look at it as an opportunity
18  and take advantages -- take advantage of the opportunities
19  available to you at the Bureau of Prisons and get this
20  unfortunate portion of your life put behind you.  A hundred and
21  21 months is a long time to serve, and I want you to take
22  advantage of those opportunities.  I wish you the best of luck,
23  Ms. Pitts.  You are remanded to the custody of the marshal.  Is
24  there anything else we need to take up in this matter from the
25  United States?

89

1       MR. MOORER:  No, Your Honor.

2       THE COURT:  Anything else we need to take up from the

3 defense?  Mr. Teague, is there anything else we need to take up

4 from the defense in this matter before we adjourn this hearing?

5       MR. TEAGUE:  No, Your Honor.

6       THE COURT:  Good luck to you, Ms. Pitts.  You are in

7 the custody of the marshal.  We will be in recess.

8       (At which time, 3:16 p.m., the hearing was adjourned.)

9       * * * * * * * * * * *

10       COURT REPORTER'S CERTIFICATE

11       I certify that the foregoing is a correct transcript

12 from the record of proceedings in the above-entitled matter.

13       This 31st day of January, 2007.

14

15       /s/ James R. Dickens
      Official Court Reporter

16

17

18

19

20

21

22

23

24

25